AMERICAN TUNABOAT ASSOCIATION;
Bonjenval Holdings, Ltd., a corporation
individually and on behalf of all persons
similarly situated, Plaintiffs–Appellants,

v.

Ronald H. BROWN, Secretary of
Commerce, et al., Defendants–
Appellees.

No. 94–16275.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 13, 1995.

Decided Oct. 10, 1995.

August Felando, San Diego, California, for plaintiffs-appellants.

M. Alice Thurston, United States Department of Justice, Washington, DC, for defendants-appellees.

Joshua R. Floum, Heller, Ehrman, White & McAuliffe, San Francisco, California, for amicus curiae Earth Island Institute.

Before: FLETCHER, PREGERSON, and RYMER, Circuit Judges.

Opinion by Judge PREGERSON; Partial Concurrence and Partial Dissent by Judge RYMER.

PREGERSON, Circuit Judge:

Plaintiffs–Appellants American Tunaboat Association, et al. ("ATA") appeal the district court's order denying a preliminary injunction to prevent Defendants–Appellees Ronald H. Brown, Secretary of Commerce, et al. from enforcing a Notice of Fishery Closure. They also seek review of the district court's grant of partial summary judgment that decided the merits of the request for an injunction against enforcing the fishing ban for the remainder of the 1994 season. Thus, the preliminary injunction motion and the relief sought in the summary judgment motion are the same—to enjoin enforcement of the fishery's closure. On February 7, 1994, the National Marine Fisheries Service ("NMFS") prohibited ATA from engaging in purse seine tuna fishing for the remainder of 1994. NMFS concluded that ATA had already reached the quota set by the International Dolphin Conservation Act ("IDCA") for the number of dolphin mortalities that may result in 1994 from the purse seining of tuna. The district court upheld NMFS's interpretation of the IDCA. The district court also

concluded that ATA failed to satisfy the requirements for a preliminary injunction with respect to its claim that the Notice of Closure was issued in violation of agency regulations. We affirm.

■ A grant of partial summary judgment is generally not appealable. *Sierra Club v. Dep't of Transportation,* 948 F.2d 568, 571 (9th Cir.1991). However, we recognize an exception to this rule if the effect of the summary judgment is to deny a preliminary injunction. In such cases, jurisdiction to hear the appeal obtains under 28 U.S.C. § 1292. *Hotel & Restaurant Employees v. Rollison,* 615 F.2d 788, 793 n. 15 (9th Cir. 1980); *Safe Flight v. McDonnell–Douglas,* 482 F.2d 1086, 1093 (9th Cir.1973).

We have jurisdiction to review the district court's denial of ATA's application for a preliminary injunction under 28 U.S.C. § 1292.

## BACKGROUND

Congress enacted the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361–1407, in 1972 to protect marine mammals, including dolphins, from the adverse effects of human activities. To achieve this goal, Congress established a moratorium on the "taking" of marine mammals, 16 U.S.C. § 1371(a), but provided that marine mammals may be taken incidentally in the course of commercial fishing operations and that permits may be issued therefor. 16 U.S.C. § 1371(a)(2).

In 1984, Congress, concerned with the length and complexity of the quota-setting process,[1] amended the MMPA by incorporating the terms and conditions of the 1980 ATA General Permit into the statute itself. The MMPA governed the terms of the ATA's permit until 1992, when Congress amended the MMPA by enacting the IDCA to "eliminate the marine mammal mortality resulting from the intentional encirclement of dolphins and other marine mammals in tuna purse seine fisheries." 16 U.S.C. §§ 1411(a)–(b).

Congress established two principal mechanisms to carry out this policy. First, the IDCA called for efforts by the United States to negotiate a global moratorium with other fishing nations to prohibit the encircling of marine mammals, to take effect by March 1, 1994.[2] 16 U.S.C. § 1412.

Second, Congress declared that the ATA's General Permit "shall expire March 1, 1994, unless no major purse seine tuna fishing country enters into an agreement" with the United States to establish a global moratorium on the intentional taking of marine mammals. 16 U.S.C. § 1416(a)(3). If no international agreement is negotiated, Congress specified in 16 U.S.C. §§ 1416(a)(4)(A)–(D) that the ATA's General Permit shall be limited as follows:

(A) the total dolphin mortalities authorized by the permit for each year after 1992 ... shall not exceed the number of dolphin mortalities which occurred under the permit during the preceding year;

(B) the total dolphin mortalities occurring under the permit each year shall continue to be reduced by statistically significant amounts each year to levels approaching zero by December 31, 1999;

(C) the permit shall be subject to any additional restrictions that the Secretary considers appropriate; and

(D) the permit shall expire December 31, 1999.

Congress also specified that for the period beginning January 1, 1992, and ending December 31, 1992, total dolphin mortalities shall not exceed 1,000, and for the period beginning January 1, 1993 and ending March 1, 1994, total dolphin mortalities shall not

---

1. In 1980, the NMFS, the agency charged with enforcing the MMPA, issued a permit to the ATA, an association whose members are owners of United States vessels that fish for tuna using the purse seine method. NMFS determined that ATA could take up to 20,500 dolphins annually during a five-year period (1981–85). ATA challenged the rulemaking and permit proceedings. In *American Tunaboat Assoc. v. Baldrige,* 738 F.2d 1013 (9th Cir.1984), we invalidated the quota because NMFS had failed to base its quota calculation on the best available scientific information, as required under the MMPA.

2. Congress recognized that despite the progress that had been made under the MMPA, a major obstacle to the conservation of marine mammals had been the difficulty of imposing the MMPA's requirements on the fishing fleets of nations other than the United States. H.R.Rep. 102–746(I), 102d Cong., 2d Sess. 8 (1992), U.S.C.C.A.N.1992, pp. 2919, 2921.

exceed 800. 16 U.S.C. § 1416(a)(1). Congress set a one-time quota for fourteen months because it anticipated that a global moratorium would take effect by March 1, 1994, which would then negate the ATA's permit altogether.

By December 1993, none of the major purse seining countries had indicated any interest in agreeing to a global moratorium, and that the United States' effort to establish such a moratorium by March 1994 had failed.

During January and the first week of February 1994, NMFS received alarming reports of exceptionally high levels of dolphin mortalities. NMFS found that ATA vessels had amassed 107 dolphin mortalities in this short period.

Concerned that the ATA's overall mortality would exceed the total of 115 dolphins killed in 1993, NMFS issued ATA a "Notice of Fishery Closure" on February 7, 1994. NMFS determined that because it was widely recognized that no global moratorium on the intentional taking of dolphins would take effect by March 1, 1994, 16 U.S.C. § 1416(a)(4)(A) (which prohibits dolphin mortalities from exceeding the number of mortalities which occurred during the preceding year), now governed the ATA's permit.

The Notice of Closure stated that effective February 8, 1994, "the taking of all dolphins is prohibited for the remainder of 1994." The notice explained that ATA's 1994 quota for the number of incidental takings of dolphins was 114, and that based on the current dolphin mortality rate and the projected rate of mortalities, this limit would be reached by the end of the day on February 7, 1994.

On February 25, 1994, ATA filed the instant suit in the United States District Court for the Southern District of California, seeking a temporary restraining order or preliminary injunction to prevent NMFS from enforcing the Notice of Closure.[3] ATA claimed that 16 U.S.C. § 1416(a)(1) explicitly specifies that the applicable quota under the IDCA for the period January 1, 1993 to February 28, 1994 is 800, not 114. ATA also claimed that because NMFS failed to publish the effective

date of the closure in the Federal Register, and only gave ATA one day's notice to close the fisheries, NMFS issued the Notice of Closure in violation of the seven-day notice procedure required under 50 C.F.R. § 216.24(d)(2)(i)(B).

On July 6, 1994, Judge Henderson denied ATA's application for a preliminary injunction on ATA's claim that NMFS's Notice of Closure violated the language and purpose of the IDCA. Judge Henderson concluded that ATA was unlikely to succeed on the merits of their substantive challenge to the Notice of Closure. Because there were no disputed facts material to the case, Judge Henderson *sua sponte* granted summary judgment as a matter of law in favor of NMFS.

With respect to ATA's claim that NMFS issued the Notice of Closure in violation of agency regulations, Judge Henderson denied the application for a preliminary injunction because ATA failed to show that it would suffer irreparable injury. ATA now appeals.

## ANALYSIS

**1. NMFS's calculation of ATA's 1994 dolphin mortality quota.**

### a. Mootness of Appeal

■ A case is moot if it has lost its character as a present, live controversy. *United States v. Geophysical Corp.*, 732 F.2d 693, 698 (9th Cir.1984). We cannot take jurisdiction over a claim as to which no relief can be granted. *Id.*

■ ATA's appeal of the district court's denial of its application for a preliminary injunction is moot because 1994 has passed. We cannot grant any relief to ATA because NMFS's directive, which closed ATA's fisheries from February 8, 1994 to December 31, 1994, was only in effect in 1994.

However, ATA's appeal of the district court's grant of summary judgment in favor of NMFS is not moot. NMFS's calculation of ATA's 1994 dolphin mortality quota, if upheld, will serve as the base by which quo-

---

**3.** Because an action involving the same parties and related issues was pending before Chief Judge Thelton E. Henderson in the United States District Court for the District of Northern Cali-

fornia, *Earth Island Institute v. Brown*, No. C 88–1380 TEH (N.D.Cal.), this case was transferred to that court and reassigned to Judge Henderson.

tas for upcoming years will be calculated. The complaint requested declaratory as well as injunctive relief for this very reason, we assume, and pressed for review of the summary judgment on the merits.

At oral argument, NMFS contended that the instant appeal is moot because none of ATA's vessels had applied for a permit for the year 1995, thus obviating the need to calculate the 1995 quota. However, since then, four ATA vessels have applied for a permit from NMFS. Accordingly, this appeal is not moot.

### b. District Court's Grant of Summary Judgment

A grant of summary judgment is reviewed de novo. *Jesinger v. Nevada Federal Credit Union,* 24 F.3d 1127, 1130 (9th Cir.1994). Because there are no disputed facts material to this case, we need only review the district court's interpretation of the IDCA. The interpretation of a statute is a question of law reviewed de novo. *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1571 (9th Cir. 1993).

██ In ascertaining the intent of Congress, we must "interpret language in one section of a statute consistently with language of other sections and with the purposes of the entire statute considered as a whole." *Adams v. Howerton,* 673 F.2d 1036, 1040 (9th Cir.), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982).

██ In addition, when reviewing an agency's interpretation of the statute it administers, we must accord broad deference to the agency's construction. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Under *Chevron,* we need not conclude that NMFS's construction was the only one it permissibly could have adopted, or even the reading we would have reached if the question initially had arisen in a judicial proceeding. *Id.* at 843 n. 11, 104 S.Ct. at 2782 n. 11. *See also United States v. Morton,* 467 U.S. 822, 834, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680 (1984) ("[L]egislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.").

### 2. The Applicable Quota for the Period January 1, 1994 to February 28, 1994.

██ ATA's dolphin mortality for 1993 was 115. However, from January 1, 1994 to February 7, 1994, ATA's dolphin mortality had already reached 107. ATA claims that 16 U.S.C. § 1416(a)(1) (hereinafter "designated quota provision") explicitly provides that for the period beginning January 1, 1993, and ending March 1, 1994, total dolphin mortalities shall not exceed 800. Because ATA had killed only 222 dolphins from January 1, 1993 to February 7, 1994, ATA contends that it had not reached its allowable quota on the day NMFS issued the Notice of Closure.

We disagree. It was widely recognized by December 1993 that no global moratorium would occur by March 1, 1994. Thus, it was reasonably certain that 16 U.S.C. § 1416(a)(4)(A) (hereinafter "annual reduction provision") [4] would take effect on March 1, 1994. ATA's dolphin mortality for the first few weeks of 1994 threatened to surpass the number of dolphin mortalities for the entire year of 1993. As such, it became necessary for NMFS to enforce the annual reduction provision before its effective date of March 1, 1994 in order to prevent ATA from already having violated the provision by the time the provision officially takes effect.

The apparent conflict between § 1416(a)(4)(A) (the annual reduction provision) and § 1416(a)(1) (the designated quota provision) arises only because ATA's dolphin mortality for the first few weeks of 1994 threatened to outstrip the number of dolphin mortalities for 1993, and because it was reasonably certain by February 7, 1994, the day NMFS learned about the alarmingly high rate of dolphin mortalities, that no global moratorium would ensue by March 1, 1994.

Congress, in all likelihood, did not anticipate this situation. Nor, quite evidently, did Congress speak to this issue. Under such circumstances, *Chevron* instructs us to determine whether NMFS's interpretation of the IDCA was a "permissible construction." 467

---

4. As noted above, this provision prohibits the dolphin mortality for each year after 1992 from exceeding the number of dolphin mortalities which occurred during the preceding year.

U.S. at 843, 104 S.Ct. at 2782; *see also United States v. Koyomejian,* 946 F.2d 1450, 1453 (9th Cir.1991) (citations omitted) ([When Congress has not addressed an issue, courts] "must find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.").

A plain reading of § 1416(a) in its entirety indicates that Congress intended to: (1) impose a ceiling of 800 dolphins for the period beginning January 1, 1993 and ending March 1, 1994; (2) establish a global moratorium by March 1, 1994; and (3) if no global moratorium occurs, to prohibit the number of dolphin mortalities for each year after 1992 from exceeding the number of mortalities which occurred in the preceding year. This statutory scheme is internally consistent, except when applied to the unusual circumstances of this case.

Even though Congress may not have intended for § 1416(a)(4)(A) (the annual reduction provision) to take effect until March 1, 1994, the alarming rate of ATA's dolphin mortality for the first few weeks of 1994 threatened to surpass the rate for the entire year of 1993. As such, the annual reduction provision would have been rendered null had NMFS waited until March 1, 1994 to issue the Notice of Closure. Congress clearly did not intend for such a situation to occur for several reasons.

First, when it explicitly imposed § 1416(a)(4)(A)'s (the annual reduction provision) limitation on "each year after 1992," it did not make any exceptions for the period January 1, 1994 to February 28, 1994. Indeed, as noted above, Congress in all probability did not anticipate that the mortality rate for the first few weeks of 1994 would surpass that for the entire year of 1993. Thus, even though the annual reduction provision technically should not have been triggered until March 1, 1994, the deadline for the establishment of a global moratorium, we refrain from resorting to an "unduly literal interpretation" of the provision, because doing so would "eviscerate the clear intent of Congress." *Barnes v. Donovan,* 720 F.2d 1111, 1114 (9th Cir.1983).

Upholding the authority of NMFS to issue a Notice of Closure before March 1, 1994 is the only way to fully effectuate the underlying purpose of the annual reduction provision and of the IDCA as a whole. The first two stated purposes of the IDCA are to "eliminate the marine mammal mortality resulting from the intentional encirclement of dolphins and other marine mammals in tuna purse seine fisheries" and to "secure appropriate multilateral agreements to reduce, and eventually eliminate" such mortalities. 16 U.S.C. § 1411(b)(1)–(2). Congress recognized that the major obstacle to conserving dolphins was the difficulty of imposing the restrictions of the MMPA on foreign countries. *See* H.R.Rep. 102–746(I), 102d Cong., 2d Sess. 8 (1992). Thus, Congress's primary objective in its dolphin conservation effort was to establish a global moratorium, and only if it failed in this endeavor did it plan to resort to other means of conservation.

16 U.S.C. § 1416(a)(4)(A) (the annual reduction provision) reflects this approach. This provision, which was designed to eliminate all dolphin mortalities in the United States by the year 1999, takes effect only if no global moratorium had been established by March 1, 1994. The clear purpose of the provision was to produce, at least in the United States, the same effect that a global moratorium would have produced, *viz.,* the elimination of all dolphin mortalities by the year 1999.

Thus, when it became evident in December 1993 that a global moratorium could not possibly occur by March 1, 1994, the annual reduction provision became enforceable, particularly under the circumstances of the instant case, where the provision would have already been violated if NMFS waited until that date to enforce it. It was only because ATA amassed virtually the same number of dolphin mortalities in the first few weeks of 1994 than it had in the entire year of 1993, a pattern Congress reasonably did not anticipate, that it became necessary for NMFS to enforce the restrictions before March 1, 1994.[5]

---

5. Moreover, the critical prerequisite to triggering § 1416(a)(4)(A) (the annual reduction provision), that there will be no global moratorium by March 1, 1994, effectively had occurred by December 1993. Nothing in the language or legis-

■ Importantly, enforcing the annual reduction provision before March 1, 1994 would not undermine the purpose of the designated quota provision. First, the designated quota provision, which prohibits dolphin mortalities from exceeding 800 during the period beginning January 1, 1993 and ending March 1, 1994, is a *ceiling* on the number of dolphin mortalities for that period, not an absolute entitlement. Congress designated a specific quota for this period to make sure that ATA reduced the dolphin mortality to a level lower than the mortality in 1992 by a statistically significant margin. H.R.Rep. 102–746(I), 102d Cong., 2d Sess. 20 (1992).

Second, as the statutory scheme shows, Congress enacted the designated quota provision with the express expectation that it would be replaced either by a global moratorium or by § 1416(a)(4)(A) (the annual reduction provision). *See generally* 16 U.S.C. § 1416(a). Thus, when it became clear that no global moratorium would occur, and that the annual reduction provision was in danger of being violated, fidelity to the underlying purpose of the statutory scheme required NMFS to replace the designated quota provision with the annual reduction provision.

NMFS's interpretation of the annual reduction provision and the designated quota provision effectuates the underlying purposes of these two provisions and the overriding purpose of the IDCA to eliminate dolphin mortalities by the year 1999. As such, it more than qualifies as a "permissible construction." *Chevron, supra,* 467 U.S. at 843, 104 S.Ct. at 2782.

**3. The meaning of "year" and "preceding year" as these terms apply to the period March 1994 to December 1994.**

■ ATA contends that for purposes of 1994, the annual reduction provision's requirement—that dolphin mortalities "for each year after 1992" may not exceed the number of mortalities which occurred during the preceding year—means the *ten-month period* beginning March 1, 1994 and ending December 31, 1994.

ATA's view of the term "year" contravenes the plain language of the IDCA and frustrates the statute's overriding purpose to eliminate dolphin mortalities by the year 1999. 16 U.S.C. § 1416(a)(4)(A) states that if no global moratorium exists by March 1, 1994, "the total dolphin mortalities ... for each year after 1992 ... shall not exceed the number of dolphin mortalities which occurred ... during the preceding year."

This provision plainly refers to calendar years. First, when read in context, the phrase "for each year after 1992" can only mean the calendar years 1993, 1994, etc. Nowhere does Congress indicate that "each year after 1992" could also mean a ten month period within, say, the year 1994.

Second, all other uses of the term "year" in the IDCA refer to calendar years. For example, 16 U.S.C. § 1416(a)(4)(B) states: "the total dolphin mortalities occurring ... *each year* shall continue to be reduced ... to levels approaching zero by *December 31, 1999.*" (Emphasis added.) Moreover, when Congress intended a particular time period in the IDCA to mean a period other than a calendar year, it stated so expressly. Thus, in 16 U.S.C. § 1373(f), Congress specified that the Secretary of Commerce shall report to Congress and the public on the status of all marine mammal species "within six months after the effective date of [the statute] and every twelve months thereafter."

With the exception of one case, courts have held that the term "year" or "current year," when used as a method of identifying a particular 12–month period of time, has been construed to mean a calendar year, the period beginning January 1, and ending December 31. *See What 12–Month Period Constitutes "Year" or "Calendar Year" as Used in Public Enactment, Contract, or Other Written Instrument,* 5 A.L.R.3d 584, 588.

ATA next argues that for the year 1994, the term "preceding year" in § 1416(a)(4)(A) (the annual reduction provision) refers to the period March 1, 1993 to February 28, 1994. Accordingly, the dolphin mortalities which occurred during this twelve-month period should be the base quota by which the quota

---

lative history of the IDCA suggests that Congress intended to withhold NMFS's authority to en-

force the annual reduction provision until March 1, 1994, *per se.*

for the March 1, 1994 to December 31, 1994 period should be calculated.

ATA cites 5 A.L.R.3d 584, 589 to support its view that the term "preceding year" has been held to identify a twelve-month anniversary-to-anniversary period. However, the A.L.R. also notes that the construction of such terms depends upon the context in which the word is used and upon the expressed or implied intention of the legislature. *Id.* at 586.

Because Congress clearly intended the term "year" to mean a calendar year, the term "preceding year" must perforce mean a calendar year as well. As the district court noted, the year preceding a calendar year is itself a calendar year. There is simply no indication in the IDCA that Congress intended otherwise.

Given the statutory support for NMFS's interpretation of the terms "year" and "preceding year," and the soundness of NMFS's interpretation of the other aspects of the annual reduction provision and the designated quota provision, discussed *infra*, we uphold NMFS's calculation of ATA's 1994 dolphin mortality quota.

**4. NMFS's failure to follow the seven-day notice requirement.**

■ The grant or denial of a preliminary injunction should be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact. *Miller v. California Pacific Medical Center*, 19 F.3d 449, 455 (9th Cir.1994) (en banc).

In *EEOC v. Recruit U.S.A., Inc.*, 939 F.2d 746, 752 (9th Cir.1991), we held that a preliminary injunction may be granted only if the plaintiff shows:

> Either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in [the plaintiff's] favor.

50 C.F.R. § 216.24(d)(2)(i)(B) requires NMFS to publish in the Federal Register the date of an ordered closure at least seven days before the effective date of the closure. The Notice of Closure that ATA received was neither published in the Federal Register nor issued seven days before its effective date.

We affirm the district court's conclusion that ATA demonstrated that it would probably succeed on the merits of this claim, but that ATA failed to show the likelihood of irreparable injury. Because ATA's claim is that NMFS failed to follow the seven-day notice requirement, the likely remedy for this violation would be an order requiring NMFS to allow ATA to fish using the purse seine method for the seven days after NMFS publishes the Notice of Closure in the Federal Register. Thus, the financial losses claimed by ATA only consist of a week's worth of revenue. The district court correctly concluded that a delay in obtaining this relief falls far short of qualifying as irreparable injury.

Injury of a strictly monetary nature generally is not cognizable as a basis for issuing an injunction when balanced against the possibility of irreparable injury to marine mammals. *See Earth Island Institute v. Mosbacher*, 746 F.Supp. 964, 975 (N.D.Cal.1990), *aff'd*, 929 F.2d 1449 (9th Cir.1991). *Cf. Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely ... the balance of harms will usually favor ... protect[ing] the environment.").

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of NMFS on the substantive validity of the Notice of Closure, and we AFFIRM the district court's denial of ATA's application for a preliminary injunction on the procedural violation claim.

RYMER, Circuit Judge, concurring in part and dissenting in part:

Although as a practical matter it makes good sense to go ahead and resolve the appeal from the district court's entry of summary judgment, it is only a partial summary

judgment. Since the preliminary injunction is moot, the partial summary judgment doesn't seem to me to act to deny any preliminary relief. Because I think we therefore lack jurisdiction over the summary judgment issues, I concur only in Parts I.a and 2 of the opinion.