**AMERICAN RIVERS; Idaho Rivers United, Inc.; Pacific Coast Federation of Fishermen's Associations, Inc.; Institute for Fisheries Resources; Natural Resources Council of Oregon; Sierra Club; Federation of Fly Fishers; Trout Unlimited, Plaintiffs–Appellants,**

**v.**

**NATIONAL MARINE FISHERIES SERVICE; United States Army Corps of Engineers; Bureau of Reclamation, Defendants–Appellees,**

**and**

**Aluminum Company of America; ELF Autochem North America, Inc.; Columbia Falls Aluminum Company; Kaiser Aluminum & Chemical Corporation; Intalco Aluminum Corporation; Northwest Aluminum Company; Oregon Metallurgical Corporation; Reynolds Metals Company; Vanalco Inc.; Public Power Council, Defendants–Intervenors–Appellees,**

**and**

**Pacific Northwest Generating Cooperative, Intervenor–Appellee.**

**No. 95–35462.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 11, 1996.

Decided April 2, 1997.

---

Adam J. Berger, Sierra Club Legal Defense Fund, Seattle, Washington, for the plaintiffs-appellants.

Peter A. Appell, United States Department of Justice, Washington, D.C., for the federal defendants-appellees.

James L. Buchal, Ball, Janik & Novack, Portland, Oregon, for the intervenors-appellees.

Before: FERGUSON and BRUNETTI, Circuit Judges, and SAMUEL P. KING,[*] District Judge.

FERGUSON, Circuit Judge:

Environmental and commercial fishing organizations[1] (collectively "American Rivers"), appeal the district court's denial of their motion for summary judgment and its grant of defendants' cross-motion for summary judgment. The defendants are the National Marine Fisheries Service ("NMFS") and the federal agencies[2] that operate the Federal Columbia River Power System ("River Power System"). American Rivers contends that the federal agencies violated § 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), because the operation of the River Power System jeopardizes the existence of the Snake River salmon and adversely modifies the salmon's critical habitat. Specifically, American Rivers challenges the federal agencies' decision to use transportation measures-moving juvenile salmon downstream in trucks and barges-to avoid a determination that the operation of the River Power System jeopardizes the existence of the salmon.

## I.  BACKGROUND

### A.  Factual Background

#### 1.  Basic Facts

"Salmon and hydropower are the two great natural resources of the Columbia River Ba-

sin." *Northwest Resource Info. Ctr., Inc. v. Northwest Power Planning Council,* 35 F.3d 1371, 1375 (9th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995) (hereinafter *Northwest Power* ). The present case involves the continuing conflict between these two important resources.

Snake River sockeye and chinook salmon are anadromous fish—they hatch and spend their first years in fresh water, reach mature size while rearing in the Pacific Ocean, and return to their natal streams and lakes to spawn and die. Anadromous fish runs in the Columbia River Basin have dwindled as a result of human activities since the European settlement of the Northwest. *Northwest Power,* 35 F.3d at 1376. The decline of these stocks of salmon has been caused by over-harvest, habitat degradation, predation, poor ocean rearing conditions, and the construction and operation of over 200 dams in the Columbia River Basin. 57 Fed.Reg. 14,654, 14,660, 14,661.

In 1991, National Marine Fisheries Service listed the Snake River sockeye salmon as an endangered species. 56 Fed.Reg. 58,619. The following year, NMFS listed the Snake River spring/summer and fall chinook[3] as threatened species. 57 Fed.Reg. 14,653–54. On December 28, 1993, NMFS designated the critical habitat[4] for these three species, which encompasses the Snake River and Columbia River migratory corridor. 58 Fed.

---

[*] The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

[1] The appellants are: American Rivers; Idaho Rivers United, Inc.; Pacific Coast Federation of Fishermen's Associations, Inc.; Institute for Fisheries Resources; National Resources Council of Oregon; Sierra Club; Federation of Fly Fishers; and Trout Unlimited.

[2] The United States Army Corps of Engineers and the Bureau of Reclamation operate the federally-owned dams on the Columbia and Snake Rivers.

[3] The Columbia River Basin produces four principle species of salmon: chinook, sockeye, coho,

and chum. Biologist distinguish salmon species by "seasonal races" or "runs" and "tributary stocks" and river "substocks." Thus, the Snake River fall chinook is a fall race and a Snake River stock. *Northwest Power,* 35 F.3d at 1375 n. 4.

[4] Generally, the term "critical habitat" means the specified areas within the geographical area occupied by the species where there are physical or biological features essential to the conservation of the species and which may require special management considerations or protection. 16 U.S.C. § 1532(5)(A).

Reg. 68,544. Despite the salmon's listed[5] status, only one Snake River sockeye returned to spawn in the Snake River in 1994. In 1995, only 1,800 Snake River spring/summer chinook and 350 Snake River fall chinook returned to the river to spawn. These numbers demonstrate that the listed salmon continue their march toward extinction.

The present controversy between salmon and hydropower concerns the downstream migration of juvenile salmon or "smolts" in the Columbia River Basin. Once the salmon hatch in the upstream areas of the Columbia River Basin, the smolts travel downstream to the Pacific Ocean. During this downstream migration the smolts pass eight of the dams and reservoirs that are part of the River Power System. The Bureau of Reclamation and the Corps of Engineers operate these hydroelectric, flood control, and water storage projects. The importance and magnitude of the River Power System is demonstrated by the fact that it generates approximately half of the electricity used in the Pacific Northwest.

All parties agree that the existence of the River Power System impedes the migration of salmon. At present, there are four ways in which the salmon migrating downstream may pass the eight mainstream Columbia and Snake River hydroelectric projects. The salmon may: (1) spill over the dams; (2) pass through the power turbines; (3) bypass to transportation facilities, including barges or trucks; or (4) bypass back into the river. *Idaho Dep't of Fish & Game v. National Marine Fisheries Serv.*, 850 F.Supp. 886, 889 n. 5 (D.Or.1994), *vacated as moot*, 56 F.3d 1071 (9th Cir.1995). Each of these methods is subject to scientific debate as to its effectiveness and benefit to the listed salmon. *See Northwest Resource Information Center, Inc. v. National Marine Fisheries Serv.* (hereinafter *National Marine*), 56 F.3d 1060, 1063–64 (9th Cir.1995) (discussing the mechanics and relative benefits of each method).

Regardless of how the smolts pass the dams, the operation of the River Power System causes mortality to the smolts during their downstream migrations. The dams reduce water flow through reservoirs which slows the salmon's passage and contributes to salmon mortality. The salmon's slow passage through these reservoirs increases the exposure time of the juvenile salmon to: (1) predation; (2) higher water temperatures which make the salmon more susceptible to disease; and (3) water quality problems including dissolved gas supersaturation which causes gas bubble disease in juvenile and adult salmon. Moreover, during downstream migration some of the smolts pass through the hydroelectric turbines and emerge injured or disoriented, rendering them easy prey for squawfish. Furthermore, smolts that are diverted through the bypass systems at the dams may suffer descaling, disorientation, and stress.

The gravity of the salmon mortality problem is illustrated by NMFS's own estimate of cumulative passage mortality, which was as high as ninety-one percent for spring/summer chinook passing the mainstream hydroelectric projects. Salmon passage mortality through the River Power System can conceptually be divided into: (1) natural mortality; (2) additional mortality due to the existence of the River Power System; (3) additional mortality that varies with the operation of the River Power System; and (4) additional mortality from other human activities. However, the extent of the smolt mortality that is a direct result of the operation of the River Power System is unknown.

### 2. The Smolt Transportation Program

In 1968, NMFS first experimented with transportation as a means of facilitating the smolts downstream migration. Snake River smolts have been transported from Lower Granite, Little Goose, and McNary Dams since the 1970s and from Lower Monumental Dam since 1993. Today the smolt trans-

---

**5.** A listed species is any species which has been determined to be endangered or threatened. 50 C.F.R. § 402.02.

portation program entails removing the migrating juvenile salmon from the river, transporting them around the dams, and then releasing them back into the Columbia River below Bonneville Dam to continue their journey to the Pacific Ocean.

The Corps of Engineers operates the transportation program during the juvenile migration season.[6] All four dams involved in the transportation program have mechanical bypass systems that divert a portion of the juvenile salmon away from the power house turbines and into vertical gatewells. From the gatewells, the salmon pass through small orifices into bypass channels which run the length of the power house. The salmon then enter a primary dewatering facility, and then a high velocity pipe or flume that carries them to the transportation facility where they are separated, sorted, marked, and examined. The salmon then are held in raceways and from these raceways they are loaded into tanker trucks or barges. The transportation barges are specially equipped to circulate river water into the holding tank. It takes approximately forty hours for a barge to travel to the release site below the Bonneville Dam. Once the salmon are released, they continue their migration for another 140 miles to the Pacific Ocean.

As with the other methods of passage around the dams, transportation also causes mortality. American Rivers contends that transportation results in the following negative impacts on the juvenile salmon: (1) stress and physical injury which accompanies bypass and handling; (2) predation and disease transmission during holding and transport; (3) predation at the point of release; and (4) homing impairment of returning adults. At this point in time, scientific research is inconclusive regarding the ability of

the transportation program to improve the survival of the salmon. Although the efficacy of the transportation program has been questioned, scientific evidence suggests that it is more probable than not that transportation improves the relative survival of juvenile salmon under certain hydroelectric operational scenarios and flow regimes.

### B. Statutory Framework

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1543, has both substantive and procedural provisions designed to protect endangered species and their habitat. These provisions are triggered when a species is listed as endangered or threatened. 16 U.S.C. § 1533. Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species...." 16 U.S.C. § 1536(a)(2). If a contemplated agency action may affect a listed species, then the agency must consult with the Secretary of the Interior,[7] either formally or informally. 50 C.F.R. § 402.14(a); 16 U.S.C. § 1536(a)(4). The agency first prepares a biological assessment, in which it evaluates the potential effects of an action on the listed species and its critical habitat. 50 C.F.R. § 402.12(a). If the agency discovers that its action may affect a listed species or its critical habitat, the agency must initiate formal consultation with NMFS. 50 C.F.R. § 402.14(a). In formal consultation, NMFS must prepare a biological opinion evaluating the effects of the action. NMFS determines whether the action will jeopardize a listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). If NMFS makes a jeopardy finding, then it may also suggest reasonable and prudent alternatives to the

---

**6.** Since the listing of the Snake River salmon, the transportation program has been run under a § 10(a)(1)(A) permit of the Endangered Species Act ("ESA"). 16 U.S.C. § 1539(a)(1)(A). Section 10(a)(1)(A) authorizes the capture and removal of listed species from the wild "for scientific purposes or to enhance the propagation or survival of the affected species." 16 U.S.C. § 1539(a)(1)(A); *see also* 50 C.F.R. § 17.22(a).

The transportation program permit is premised on the idea that smolt transportation enhances the survival of the Snake River salmon.

**7.** In this case the Secretary has delegated his authority to the National Marine Fisheries Service. 50 C.F.R. § 402.01(b).

proposed action. *Id.* By definition, the reasonable and prudent alternatives may not jeopardize the listed species or result in the destruction or adverse modification of its critical habitat. *Id.*

## C. Procedural Background

A discussion of the chronology of events and the succession of biological opinions [8] is necessary to understand the disposition of this case.

On December 2, 1993, the Corps of Engineers, the Bureau of Reclamation, and the Bonneville Power Administration forwarded a biological assessment to NMFS with a request for consultation on the 1994–1998 operation of the River Power System. On March 16, 1994, NMFS issued a biological opinion ("1994–1998 Biological Opinion") that concluded the 1994–1998 River Power System operations would neither jeopardize the Snake River salmon nor adversely modify designated critical habitat.

At the time the 1994–1998 Biological Opinion was issued, a lawsuit was pending in Oregon district court regarding the 1993 Biological Opinion for the operation of the River Power System. On March 28, 1994, the district court decided that the 1993 Biological Opinion was arbitrary and capricious. *Idaho Dep't of Fish & Game v. National Marine Fisheries Serv.*, 850 F.Supp. 886, 900 (D.Or. 1994), *vacated as moot*, 56 F.3d 1071 (9th Cir.1995). As a result of the district court's holding, the federal agencies reinitiated consultation on the River Power System. However, the 1993 Biological Opinion was about to expire and the legal errors in the 1993 Biological Opinion were carried over into the 1994–1998 Biological Opinion (which had just been issued on March 16, 1994). Thus, the

federal agencies reinitiated consultation on the 1994–1998 Biological Opinion, instead of the 1993 Biological Opinion. *See Idaho Dep't of Fish & Game v. National Marine Fisheries Serv.*, 56 F.3d 1071, 1074 (9th Cir.1995).

On August 4, 1994, American Rivers filed suit against the Corps of Engineers, the Bureau of Reclamation, and the National Marine Fisheries Service.[9] The plaintiffs alleged that the 1994–1998 Biological Opinion violated § 7(a)(2) of the ESA.[10] Specifically, American Rivers contended that the federal defendants violated the ESA by relying on the transportation of Snake River smolts to conclude that the 1994–1998 operations of the River Power System are unlikely to jeopardize the continued existence of the listed salmon.

On October 21, 1994, the defendants moved for a stay in the proceedings to reinitiate consultation on the 1994–1998 Biological Opinion and bring the opinion into compliance with the district court's order in *Idaho Dep't of Fish & Game.* On November 18, 1994, American Rivers moved for summary judgment. Soon thereafter, the district court granted the defendants' motion to stay the proceedings until February 1, 1995.

On March 2, 1995, NMFS issued a new biological opinion ("1995 Biological Opinion") which superseded the 1994–1998 Biological Opinion. In contrast to the prior biological opinion, the 1995 Biological Opinion concludes that the operation of the River Power System would jeopardize the continued existence of the listed salmon and adversely modify their critical habitat. However, the 1995 Biological Opinion recommends a reasonable and prudent alternative for the operation of the River Power System.[11] The reasonable and prudent alternative relies on

---

**8.** There are three biological opinions on the operation of the River Power System: (1) the 1993 Biological Opinion; (2) the 1994–1998 Biological Opinion; and (3) the 1995 Biological Opinion.

**9.** Public Power Council, Pacific Northwest Generating Cooperative, and the Direct Services Industries intervened as defendants. All three groups represent consumers of power generated

by the dams along the mainstem Snake and Columbia Rivers.

**10.** It is important to note that the plaintiffs filed suit *after* NMFS had reinitiated consultation on the 1994–1998 Biological Opinion, but *before* the issuance of the 1995 Biological Opinion.

**11.** The reasonable and prudent alternative takes a tiered approach to reach a no-jeopardy deter-

smolt transportation as a major means of mitigating the adverse impacts of the River Power System. However, fewer listed salmon would be transported under the 1995 Biological Opinion with its reasonable and prudent alternative than would have been transported under the 1994–1998 Biological Opinion.

On March 10, 1995, the Corps of Engineers and the Bureau of Reclamation formally adopted the 1995 Biological Opinion, with its reasonable and prudent alternative. On March 15, 1995, the federal defendants filed a cross-motion for summary judgment in which they argued, inter alia, that American Rivers' claims were mooted by the issuance and adoption of the 1995 Biological Opinion. The district court held American Rivers' claims were not moot and granted the defendants' motion for summary judgment.

## II.  JURISDICTION

This case presents two threshold questions which must be decided before we address the merits. First, was American Rivers' challenge to the 1994–1998 Biological Opinion rendered moot by the issuance of the 1995 Biological Opinion? Second, is American Rivers precluded from challenging the 1995 Biological Opinion because they did not file a timely 60-day notice of intent to sue prior to initiating this action? We address these questions in turn.

### A.  Mootness

The defendants contend that American Rivers' challenge to the 1994–1998 Biological Opinion is moot because the 1995 Biological Opinion replaced the 1994–1998 Biological Opinion.[12]

■ A federal court's jurisdiction is limited to cases or controversies. U.S. Const. art. III, § 2; *Powell v. McCormack*, 395 U.S. 486, 496 n. 7, 89 S.Ct. 1944, 1950 n. 7, 23 L.Ed.2d 491 (1969). A claim is moot if it has lost its character as a present, live controversy. *American Tunaboat Ass'n v. Brown*, 67 F.3d 1404, 1407 (9th Cir.1995). A federal court does not have jurisdiction "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 449, 121 L.Ed.2d 313 (1992) (citations omitted). If an event occurs that prevents the court from granting effective relief, the claim is moot and must be dismissed. *GTE California, Inc. v. FCC*, 39 F.3d 940, 945 (9th Cir.1994); *National Marine*, 56 F.3d at 1069.

■ Issues which are "capable of repetition, yet evading review" present an exception to the mootness doctrine. *Southern Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *Alaska Fish & Wildlife Fed'n v. Dunkle*, 829 F.2d 933, 939 (9th Cir.1987), *cert. denied*, 485 U.S. 988, 108 S.Ct. 1290, 99 L.Ed.2d 501 (1988). "The doctrine is limited to extraordinary cases in which: (1) the duration of the challenged action is too short to be fully litigated before it ceases; and (2) there is a reasonable expectation that the plaintiffs will be subjected to the same action again." *Dunkle*, 829 F.2d at 939 (citation omitted); *see also Native Americans for Enola v. U.S. Forest Serv.*, 60 F.3d 645, 646 (9th Cir.1995).

In *Idaho Dep't of Fish & Game v. National Marine Fisheries Serv.*, 56 F.3d 1071 (9th Cir.1995), we addressed the issue of moot-

---

mination, on the grounds that sufficient scientific information is not available to determine with confidence what measures are necessary to ensure ultimate recovery of the listed salmon. Thus, the reasonable and prudent alternative outlines a process of planning and evaluation designed to reduce the uncertainty about the likely benefits and feasibility of major structural modifications to the River Power System. Until these long term decisions are made, the reasonable

and prudent alternative calls for various immediate actions which are necessary to improve survival until the long term recovery measures can take effect. The interim measures include a combination of augmented flow, increased spill, transportation, and other operational changes.

**12.** Public Power Council, one of the defendant-intervenors, did not join in this argument.

ness in a case which involved some of the same underlying facts as those in the present case. In *Idaho Dep't of Fish & Game*, NMFS appealed the district court's determination that the 1993 Biological Opinion was arbitrary and capricious. *Id.* at 1074. This court then held that the issuance of the 1995 Biological Opinion mooted the challenge to the 1993 Biological Opinion. *Id.* at 1075. Furthermore, we concluded the case did not fit the "capable of repetition, yet evading review" exception to the mootness doctrine because the 1995 Biological Opinion would not evade review. *Id.* We relied on the fact that the 1995 Biological Opinion spanned a period of four years, 1994–1998,[13] and thus there was still time to litigate the agency decisions made pursuant to the 1995 Biological Opinion. *Id.*; *see also Aluminum Co. of America v. Bonneville Power Admin.*, 56 F.3d 1075, 1077 (9th Cir.1995) (holding that a challenge to 1993 Biological Opinion for operations of the River Power System is moot).

■ The case at bar is not distinguishable from *Idaho Dep't of Fish & Game*, 56 F.3d 1071 (9th Cir.1995). Both cases are challenges to biological opinions on the operations of the River Power System. The only difference is that the present case began as an attack on the 1994–1998 Biological Opinion, while *Idaho Dep't of Fish & Game* was a challenge to the 1993 Biological Opinion. This difference is of no consequence. As in *Idaho Dep't of Fish & Game*, the biological opinion in the present case has been superseded by the 1995 Biological Opinion. Therefore, any challenge to the 1994–1998 Biological Opinion is moot.

■ Furthermore, American Rivers' challenge to the 1994–1998 Biological Opinion will not evade review because the 1995 Biological Opinion will not expire until 1998. Accord-

ingly, we dismiss the challenge to the 1994–1998 Biological Opinion as moot. Moreover, because the 1995 Biological Opinion was issued before the district court granted defendants' summary judgment motion, any challenge to the 1994–1998 Biological Opinion was moot below.

**B. Sixty-Day Notice**

American Rivers contends that this appeal is not moot because the 1995 Biological Opinion contains the same legal flaws as the preceding 1994–1998 Biological Opinion. The defendants respond that American Rivers cannot mount a legal attack on the 1995 Biological Opinion because the plaintiffs did not file the required 60–day notice prior to initiating this lawsuit.

Section 11(g) of the Endangered Species Act permits citizens to sue to enforce compliance with the Act. 16 U.S.C. § 1540(g). However, before a citizen can file an action, the citizen must give the Secretary of the Interior and any alleged violators written notice of intent to sue sixty days prior to filing suit. 16 U.S.C. § 1540(g)(2)(A)(i).[14] This requirement is jurisdictional. *Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir.1988).

In the present case, the plaintiffs notified the federal defendants on April 12, 1994, of their objections to the 1994–1998 Biological Opinion and their intent to sue. The letter stated, in pertinent part:

We understand that your agencies are planning to reevaluate the biological opinion in light of the court ruling in *Idaho Dep't of Fish and Game v. National Marine Fisheries Service* [850 F.Supp. 886] (D.Or.1994). It is our hope that we can work with you during the reevaluation to cure the violations alleged below. The pri-

---

13. In fact, the 1995 Biological Opinion is not limited to the period of 1994–1998. NMFS has characterized the opinion to be for "1995 and future years" to accommodate considerations of long term agency measures such as structural modification of the River Power System.

14. Section 1540(g)(2)(A) provides: No action may be commenced under [the citizen suit provision]—

(i) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation.

mary purpose of this letter is to provide notice of the scientific and legal deficiencies we perceive in the biological opinion, so that further resort to the judicial process can be avoided.

Should you fail to remedy the alleged violations, however, this letter also provides the 60–day notice of intent to sue required under ESA § 11(g)(2), 16 U.S.C. § 1540(g)(2). In particular, this letter provides notice of petitioners' intent to sue the National Marine Fisheries Service ("NMFS") over *the 1994–1998 biological opinion and any revised or replacement biological opinion suffering from the deficiencies described below.* This letter also provides notice of petitioners' intent to sue NMFS, the U.S. Army Corps · of Engineers, the Bonneville Power Administration, and the Bureau of Reclamation over any Record of Decision on Federal Columbia Power System operations based on such an unlawful biological opinion or sharing the deficiencies described below.

(emphasis added) (abbreviations omitted). The plaintiffs contend that this letter satisfies the 60–day notice requirement and that they are not barred from suing for violations in the 1995 Biological Opinion because they explicitly stated in their letter that the notice applied not only to the 1994–1998 Biological Opinion, but also to "any replacement biological opinion." Additionally, on July 11, 1995, the plaintiffs filed another 60–day notice in which they specifically gave notice of their intent to sue based on the 1995 Biological Opinion.

American Rivers argues it would be inequitable and a hypertechnical application of the 60–day notice requirement to require the plaintiffs to file a new lawsuit to challenge the transportation program in the 1995 Biological Opinion. In light of the fact that the district judge stayed the proceedings below,

while NMFS revised the 1994–1998 Biological Opinion, plaintiffs' argument is well-taken. However, the Supreme Court in *Hallstrom v. Tillamook County,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989), made clear that the "notice and 60–day delay requirements are mandatory conditions precedent to commencing suit" and equitable arguments cannot overcome this notice defect.[15] *Id.* at 31, 110 S.Ct. at 311. Moreover, the citizen suit notice requirements cannot be avoided by employing a "flexible or pragmatic construction." *Id.* at 26, 110 S.Ct. at 309.

In *Hallstrom,* the plaintiffs owned a dairy farm which was located next to the Tillamook County landfill. *Id.* at 23, 110 S.Ct. at 307. The plaintiffs sent a 60–day notice of intent to sue to Tillamook County, but failed to notify the State of Oregon or the EPA of the alleged violations of RCRA. *Id.* at 23–24, 110 S.Ct. at 307–08. When the plaintiffs filed suit one year later, the defendants moved for summary judgment on the grounds that the plaintiffs failed to notify the State of Oregon and the EPA. *Id.* One day after the motion for summary judgment, the plaintiffs attempted to cure the notice defect by giving written notice to the EPA and the State of Oregon. *Id.* The district court found the notice defect was cured. *Id.* at 24, 110 S.Ct. at 307–08. The Supreme Court, however, specifically rejected the contention that the 60–day notice provision was subject to equitable modification and cure. *Id.* at 27, 110 S.Ct. at 309. The Court held that despite the plaintiff's attempt to cure the deficient notice, the district court was required to dismiss the action as barred by the plain language of the statute. *Id.* at 33, 110 S.Ct. at 312–13.

■ In the case at bar, a strict construction of the 60–day notice requirement may appear to be inequitable and a waste of judicial resources. Nonetheless, we lack authori-

---

**15.** In *Hallstrom,* the Court interpreted the 60–day notice requirement of the Resources Conservation and Recovery Act of 1976, 42 U.S.C. § 6972(b)(1). The court acknowledged the similarity between the RCRA 60–day notice provision and the 60–day notice provision of the ESA.

*Hallstrom,* 493 U.S. at 23 n. 1, 110 S.Ct. at 307 n. 1. In *Save the Yaak Comm. v. Block,* 840 F.2d 714 (9th Cir.1988), we relied on the reasoning of *Hallstrom* when we determined that the notice requirement in the ESA is jurisdictional. *Id.* at 721.

ty to consider the equities. *See Hallstrom,* 493 U.S. at 32, 110 S.Ct. at 312. *See also Washington Trout v. McCain Foods, Inc.,* 45 F.3d 1351 (9th Cir.1995) (strictly construing the 60–day notice provision in the Clean Water Act and holding that the court lacked subject matter jurisdiction because environmental plaintiffs' notice of intent to sue did not list the names of the plaintiffs). Neither the April 1994 letter nor the July 1995 letter satisfy the 60–day notice requirement. The April 1994 letter provided the federal agencies with 60–day notice that the plaintiffs objected to the 1994–1998 Opinion. The July 1995 letter was sent after the district court granted defendants' summary judgment motion. Although this second letter would be adequate notice of intent to sue in a future challenge of the 1995 Biological Opinion, it has no significance in the case at bar. In fact, the parties informed the court at oral argument that such a challenge to the 1995 Biological Opinion is now pending in district court in Oregon.

Therefore, because the plaintiffs failed to give timely written notice of intent to sue for the deficiencies in the 1995 Biological Opinion we lack jurisdiction and must dismiss this appeal. *See Save the Yaak Committee v. Block,* 840 F.2d at 721.

### III.  CONCLUSION

We REMAND this case to the district court with instructions to VACATE the judgment below and to DISMISS the case on the grounds of mootness and improper 60–day notice. We DENY plaintiffs' request for attorneys fees under the ESA, 16 U.S.C. § 1540(g)(4). *See Carson–Truckee Water Conservancy Dist. v. Secretary of the Interior,* 748 F.2d 523, 525 (9th Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2139, 85 L.Ed.2d 497 (1985).