**LAURIE Q., by her guardian ad litem, et al., Plaintiffs,**

v.

**CONTRA COSTA COUNTY, Defendant.**

**No. C–96–3483 MHP.**

United States District Court,
N.D. California.

Feb. 17, 2004.

Michael S. Sorgen, Law Offices of Michael Sorgen, San Francisco, CA, Darren Jay Kessler, Law Offices of Darren J. Kessler, El Cerrito, CA, John Houston Scott, The Scott Law Firm, San Francisco, CA, for Plaintiffs.

Peter Obstler, Debra S. Belaga, O'Melveny & Myers, San Francisco, CA, for Defendant.

### MEMORANDUM AND ORDER RE: DEFENDANT'S MOTION TO DISMISS

PATEL, Chief Judge.

Plaintiffs Laurie Q. et al, individually and on behalf of others similarly situated, are or were special needs foster children in the care and custody of defendant Contra Costa County ("the County"). Plaintiffs maintain that the County, allegedly the representative payee of Social Security benefits for the children, impeded the adoption process and used the benefits for purposes unrelated to the children. Plaintiffs also allege that defendant engaged in widespread violations of the laws enacted to protect the children. Now before the court is defendant's motion to dismiss portions of the first, third, and sixth causes of action contained in plaintiff's second amended complaint.[1] Defendant argues to

---

1. Defendant has not moved to dismiss plaintiffs' claims for compensatory monetary relief

the court that the Eleventh Amendment bars plaintiffs' prayers for compensatory monetary relief, that the doctrine of *Younger* abstention prevents this court from granting injunctive relief on plaintiff's first cause of action, and that named plaintiffs' claims have been mooted because they are no longer within the County's foster care system. Having considered the parties' arguments and submission, and for the reasons set forth below, the court now enters the following memorandum and order.

## BACKGROUND [2]

### I. *General Factual and Procedural History*

Laurie Q., Angel L., Megan W., Christina T., Rebecca T., Jesse B., Kendra G., and Cherida L., the named plaintiffs in this action, are minors who had been or are committed to the custody of the County. Plaintiffs claim that Laurie Q. suffers from attention deficit hyperactive disorder; Angel L. is developmentally delayed; Megan W., Christine T., and Rebecca T. have special needs; Jesse B. is hyperactive; and Cherida J. is diagnosed with Joubert's Syndrome, a massive congenital brain anomaly, and cortical blindness. Plaintiffs submit that all but Cherida J. tested positive for drugs and/or alcohol at birth and that Laurie Q., Angel L., Christine T., and Rebecca T. were subject to sexual and/or physical abuse at some point. As minors, each of the named plaintiffs was taken into legal custody, made dependents of the County, and placed in foster care.

The Aid to Families with Dependent Children–Foster Care ("AFDC–FC") program is a cooperative federal-state program authorized by Title IV of the SSA, 42 U.S.C. § 601 et seq. The program in-cludes a foster care provision authorizing disbursements of funds for children placed in foster care upon a judicial determination that the children's homes are not conducive to their welfare. *See* 42 U.S.C. § 608. The federal government provides financing on a matching fund basis to states that administer the AFDC–FC program. Participation in the program is voluntary, but participating states must comply with the requirements of the Social Security Act ("SSA"). There is no cap on the amount of federal reimbursement. Currently, of the total costs for foster care maintenance in California, the federal government covers 50 percent, the state covers 37.5 percent, and each county's share is 12.5 percent.

Because of their status as indigent disabled persons, plaintiffs are entitled to receive benefits that assist in alleviating expenses incurred as a result of their special needs. These benefits include Supplemental Security Income ("SSI") and Adoption Assistance Program ("AAP") funds. Under the SSA, a qualified individual or organization may be appointed as a representative payee for an SSI beneficiary. 42 U.S.C. § 1383(a)(2)(A)(ii)(I). The payee receives the funds for the use and benefit of the SSI beneficiary. *Id.* Here, the County served as the representative payee for the minor beneficiaries who were made dependents.

Plaintiffs allege that defendant County has engaged in widespread violation of laws enacted to protect the children and to ensure them a safe childhood in a permanent family. *Inter alia*, plaintiffs allege that defendant wrongfully delayed the adoption of disabled children, misappropriated government benefits intended for the

under the third and sixth causes of action.

**2.** All facts have been gleaned from the complaint, unless otherwise noted. For the purposes of this motion to dismiss, all material allegations in the complaint will are to be taken as true and construed in the light most favorable to the plaintiff. *NL Industries, Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir.1986).

children and failed to advise potential adoptive parents of the availability of funds for individuals adopting special needs children. According to plaintiffs, defendant's behavior has violated numerous state and federal laws.

The named plaintiffs in this action originally filed suit against the Commissioner of the federal Social Security Administration and Contra Costa County in 1996. On May 22, 1997, this court dismissed all claims against the Commissioner of the Social Security Administration for lack of subject matter jurisdiction, leaving only the claims against the County. On December 19, 1997, the named plaintiffs filed a "Second Amended Complaint" that alleged six substantive causes of action against the County. On August 17, 1998, this court dismissed plaintiffs' second, fourth, and fifth causes of action, leaving only the first, third, and sixth causes of action largely intact.

## II. *Operation of California's Foster Care System*

California's foster care system involves an interlocking web of statutes that places responsibility for the care and governance of children with several different public-sector actors. The process of admitting a child into the foster care system begins with the filing of a petition to bring that child "within the jurisdiction of the juvenile court." Cal. Welf. & Inst.Code § 300; *see also id.* at § 311. The juvenile court is authorized to take jurisdiction over children under a variety of circumstances, such as when "there is a substantial risk that the minor will suffer[ ] serious physical harm inflicted nonaccidentally upon the minor by the minor's parent or guardian." *Id.* at § 300(a). Upon the filing of a peti-

tion, the juvenile court first holds a jurisdictional hearing to address the sole question of whether the child falls into one of the several categories according to which the juvenile court may take jurisdiction according to section 300. *Id.* at § 355(a). After determining that jurisdiction properly lies, the juvenile court is required to receive evidence regarding the "proper disposition" to be made of the "minor" and must then enter judgment as to that disposition; the court may make the child "a dependent child of the court," order a legal guardianship and appoint a guardian, allow the child to remain in the custody of her parent or guardian under supervision, or make any of several other arrangements to facilitate the child's well-being. *Id.* at §§ 358, 360.

The children in California's foster care system are those who have been taken from the custody of their parents or guardians and made dependent children of the court; not surprisingly, therefore, the juvenile court retains jurisdiction over all children within the system. *Id.* at §§ 300, 366. The court reviews the status of each dependent child at least every six months. *Id.* at § 366.[3] At those periodic hearings, the juvenile court must determine, *inter alia,* "the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan ... and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care." *Id.* at § 366(a). The "case plan" referenced in section 366(a) is a document setting forth the circumstances that caused the child to be placed in foster care, the goals of the child's placement, the services that the state and county are providing for the child, the success of those services in

---

**3.** In fact, even if the juvenile court leaves a child in the physical custody of her parent or guardian, the court is still required to hold a subsequent hearing no more than six months after the initial section 355 hearing in order to monitor the status of that child. Cal. Welf. & Inst.Code § 364.

aiding the child, and future plans for placing the child permanently; the legislature has declared the case plan "the foundation and central unifying tool in child welfare services." *Id.* at § 16501.1(a), (f).

Case plans are prepared by the county agency or individual in charge of administering the foster care program; the county must complete the first case plan within thirty days of the child's "initial removal" from the custody of her parent or guardian, and must update and review the plan at least every six months. *Id.* at § 16501.1(d). The juvenile court is obligated to review the case plan at each of the periodic hearings it holds, and may modify the plan as it sees fit. *Id.* at § 16501.1(f)(12). While the caseworker assigned to each child may modify the plan during the interim between court hearings, the court can hear challenges to those modifications and subsequently reverse or alter them. *Id.*

If the juvenile court adjudges that a child who has been made a dependent of the court cannot be returned home to her parent or guardian, the juvenile court must hold a hearing in order to set forth a plan for that child's long-term care and otherwise determine the "future status of the minor." *Id.* at § 366.25(a). In some cases, the court may also permanently terminate parental rights in order to establish a subsequent alternative legal guardianship of the child. *Id.* at § 366.26. A hearing under section 366.25 or 366.26, and a subsequent decision by the juvenile court to seek a long-term solution involving either adoption or permanent guardianship for the child, converts the child's situation into a so-called "permanent plan" case and triggers several other statutory requirements. The court maintains jurisdiction over the child until she is adopted, and the status of the child (including the case plan) must be reviewed every six months "to ensure that the adoption or guardianship is completed as expeditiously as possible." *Id.* at § 366.3. The use of passive voice in the previous sentence is quite deliberate; California law does not specify whether it is the juvenile court or an administrative body that must perform this review. In fact, the law declares only that "a child in foster care shall receive administrative reviews periodically but no less frequently than once every six months," and warns that "[t]he requirements of this section shall not be interpreted as requiring duplicate concurrent court and administrative reviews." *Id.* at § 16503(a), (d).[4]

Contra Costa County has elected to employ review by both an administrative panel and the Juvenile Court on an alternating basis in these "permanent plan" cases. Six months after the child is given "permanent plan" status an "Administrative Review Panel" conducts an assessment of her case plan; six months later review is before the Juvenile Court.[5] Def.App. Exh. 3, at I.[6] This pattern continues as long as the child remains within the County's foster care system. However, the County has adopted a system of ultimate judicial review for case plan modifications that is more stringent than state law requires.

4. An "administrative review" is simply "a review open to the participation of the parents of a child in foster care conducted by a panel of appropriate persons." Cal. Welf. & Inst. Code § 16503(b).

5. In Contra Costa County, the Administrative Review Panel "is generally comprised of three child welfare supervisors and/or experienced line staff, one of whom has no administrative responsibility for the outcome of the case." Def.App. Exh. 3, at III.A.1.

6. Plaintiffs have not objected to defendant's proffer of its "Appendix of Additional Judicial Authorities," and the documents included therein appear to the court as reliable copies of public County records. As such, this court will take judicial notice of the documents within defendant's appendix.

Under that system, judicial review of administratively recommended modifications is, in essence, mandatory. If the Administrative Review Panel "recommend[s] modifications [to the case plan] which are different from the current Juvenile Court orders, the Social Worker or Supervisor will be instructed to schedule a court hearing to address the recommended modifications." *Id.* at III.C.3. In addition, any participant in an administrative review hearing who "disagree[s] with the outcome" of that proceeding "may request that the matter be heard in the Juvenile Court." *Id.* at III.C.4. The County's documents do not indicate whether the Juvenile Court may decline to hear the matter if there have been no modifications to the case plan.

In addition to its responsibilities as overseer of the case plan, the Juvenile Court is empowered to "make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the minor, including medical treatment." Cal. Welf. & Inst.Code § 362(a). Of particular relevance here is the fact that "the court may ... join in the juvenile court proceedings any agency that the court determines has failed to meet a legal obligation to provide services to the minor." *Id.*

III. *Plaintiffs' Remaining Claims*

    A. *First Cause of Action: Claims Under Title IV–E*

      1. *Substantive Claims*

In 1980, Congress enacted the Adoption Assistance and Child Welfare Act (AACWA), which amended Title IV of the SSA in an effort "to provide the states with fiscal incentives to encourage a more active and systemic monitoring of children in the foster care system." *Vermont Dep't of Soc. and Rehab. Serv. v. United States Dep't of Health and Human Services,* 798 F.2d 57, 57 (2d Cir.1986), *cert. denied,* 479

U.S. 1064, 107 S.Ct. 950, 93 L.Ed.2d 999 (1987). The AACWA created the Title IV–E program, 42 U.S.C. § 670–676, which provides reimbursement to the states for foster care maintenance and adoption assistance payments made by the states on behalf of eligible children. Plaintiffs have three surviving section 1983 claims alleging violations of Title IV–E.

Plaintiffs first accuse the County of failing to prepare adequate case plans as mandated by 42 U.S.C. sections 675(1) and 671(a)(16). Under section 671(a)(16) a state or county claiming eligibility for benefits under the AACWA must institute a plan "that provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan." Section 675 defines a case plan as a written document that must include a "description of the type of home or institution in which a child is to be placed" and "a plan for assuring that the child receives safe and proper care." 42 U.S.C. § 675(1)(A) & (B). Plaintiffs contend that the County's failure to prepare appropriate case plans has resulted in a lack of recognition of plaintiffs' special needs and a consequent deficiency of essential services and therapeutic interventions.

Plaintiffs also maintain that defendant has failed to review the required case plans in a timely fashion. According to plaintiffs, this failure violates sections 671(a)(16), 675(5)(B) and 675(5)(C). Pursuant to section 671(a)(16), a case plan must provide "a case review system which meets the requirements described in section 675(5)(B) of this title with respect to each child." Under section 675(5)(B), a procedure must be in place to assure that the status of a child is reviewed no less than every six months by either a court or by administrative review, inter alia, to "determine the safety of the child" and "the

extent of compliance with the case plan." Section 675(5)(C) requires a procedure in place to assure the application of certain procedural safeguards, such as a permanency hearing in a court of competent jurisdiction not more than 12 months after a child has entered foster care and "not less frequently than every twelve months thereafter during the continuation of foster care."

Third, plaintiffs allege that defendant has failed to ensure that certain foster children receive adequate funding. According to plaintiffs, this conduct violates sections 672(a), which requires each state to make foster care maintenance payments to children who would have received AFDC payments but for their removal from their homes. Foster care maintenance payments are defined in section 675(4)(A). *See reference in* 42 U.S.C. § 672(a). Specifically, section 675(4)(A) states that "'foster care maintenance payments' means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." 42 U.S.C. § 675(4)(A). Plaintiffs believe that the County's violations of the AACWA give rise to causes of action under 42 U.S.C. section 1983.

### 2. *Class Action Organization*

On January 31, 2003, this court granted in part and denied in part the named plaintiffs' request to certify a class. The court did not grant class certification regarding either the third or sixth causes of action, but did certify a main class and a subclass of plaintiffs as to the first cause of action. The main class of plaintiffs consists of children "who were, are now, or will be dependents of the County and are eligible for federally funded foster care maintenance payments" under the AACWA. The subclass consists of all children who were or are "eligible for federal foster care aid" under the AACWA, and who thus may not have received adequate payments from the County. Plaintiffs have sought injunctive relief against the County for both the main class and the subclass and requested that this court ensure that the County complies with all applicable law in the treatment and care of these children. Plaintiffs have also requested monetary damages for the subclass of children who might be owed federal foster care aid, seeking equitable restitution of any funds that the County may have unlawfully appropriated.

### B. *Third Cause of Action: Claims Relating to SSA Section 1383*

Under the SSA, a qualified individual or organization may be appointed as a representative payee for an SSI beneficiary. 42 U.S.C. § 1383(a)(2)(A)(ii)(I). The payee receives the funds for the use and benefit of the SSI beneficiary. *Id.* In this case, the County has served as the representative payee for two of the named plaintiffs who were made dependents.

Two surviving claims relate to section 1383 of the SSA. First, plaintiffs contend that defendant has shirked its responsibility as a representative payee for the children by failing to place SSI benefits in individual trust accounts. The SSA requires that:

Each representative payee of an eligible individual under the age of 18 who is eligible for the payment of benefits described in subclause (II) shall establish on behalf of such individual an account in a financial institution into which such benefits shall be paid, and shall thereafter maintain such account for use in accordance with clause (ii).

42 U.S.C. § 1383(a)(2)(F)(I)(I). Clause (ii) mandates that the funds in the account are

to be used solely for allowable expenses, which are also defined by the statute. 42 U.S.C. § 1383(a)(2)(F)(ii)(I) & (II). Furthermore, one of the regulations promulgated under the law states that representative payees are to be governed by the rules applicable to trustees. 20 C.F.R. § 404.2045.

Second, plaintiffs maintain that the County has impermissibly commingled the SSI benefits in a general fund and failed to pay interest on the benefits. There is no specific section of the SSA preventing commingling of funds. However, the language of section 1383(a)(2)(F)(I)(I) imposing a duty to keep individual accounts implies that commingling of funds would violate the SSA. Nowhere does the SSA require representative payees to place SSI funds in an interest-bearing account. In support of their argument that representative payees should place SSI funds in interest-bearing accounts, plaintiffs cite to 20 C.F.R. § 404.2045, which states that representative payees are to be governed by the rules applicable to trustees. The court has understood plaintiffs to "request equitable restitution of purportedly mishandled funds"—if indeed monies were unlawfully taken from the County's foster care children—under this cause of action.

## C. Sixth Cause of Action: Claims Under the ADA

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be ... denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Plaintiffs contend that the County has violated the ADA by failing to apply for all of the government benefits to which the plaintiffs as disabled children are entitled; by hindering adoption opportunities for disabled children; and by declining to refer plaintiffs to the California Regional Center System, whose mandate is to determine levels of care needed by the developmentally disabled. Plaintiffs have sought injunctive relief and monetary damages.

## IV. Defendant's Motion to Dismiss

Defendant has moved to dismiss three portions of plaintiffs' remaining claims on three separate grounds. First, defendant alleges that plaintiffs' prayer for monetary damages set forth as part of their first cause of action (the subclass claims) is barred by Eleventh Amendment sovereign immunity. Second, defendant claims that *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), requires that this court abstain from hearing plaintiffs' claims for prospective injunctive relief in their first cause of action (the main class claims). Third, defendant argues that all claims for prospective injunctive relief under plaintiffs' first, third, and sixth causes of action are moot as to all plaintiffs who have been adopted and therefore no longer remain in foster care.

## LEGAL STANDARD

## I. Eleventh Amendment Immunity

█ The Eleventh Amendment to the Constitution states that

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Supreme Court has interpreted the amendment to divest the federal courts of jurisdiction over any suit for money damages brought against a state by any person, regardless of that person's citizenship. *Pennhurst v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The Eleventh Amendment immunizes the states from liability for any type of retroactive monetary relief, whether styled as compensatory or

punitive damages or as "equitable restitution" of mis-appropriated funds; only prospective injunctive relief (with attendant ancillary monetary costs) is permitted. *Edelman v. Jordan*, 415 U.S. 651, 668, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

■ The protections of the Eleventh Amendment extend not only to states sued under their own names, but also to many state-related entities and arms of the state. "It has long been settled that the reference to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agencies and state instrumentalities." *Regents of the Univ. of Calif. v. Doe*, 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997) (citations omitted) (holding that the University of California is immune from suit under the Eleventh Amendment as an arm of the state). A court must look to the state law that establishes and controls the agency in order to ascertain whether that agency operates as an arm of the state. *Id.* at 430 n. 5, 117 S.Ct. 900 ("Ultimately, of course, the question whether a particular state agency has the same kind of independent status as a county or is instead an arm of the State . . . is a question of federal law. But that federal question can be answered only after considering the provisions of state law that define the agency's character."). The Ninth Circuit has enumerated five factors to be used in determining when a nominally non-state body is in fact a state instrumentality: (1) "whether a money judgment would be satisfied out of state funds," (2) "whether the entity performs central governmental functions," (3) "whether the entity may sue or be sued," (4) "whether the entity has the power to take property in its own name or only the power of the state," and (5) "the corporate status of the entity." *Mitchell v. Los Angeles*, 861 F.2d 198, 201 (9th Cir.1988).

■ In this multi-factor analysis, the first factor predominates. *Belanger v. Madera Unified School District*, 963 F.2d 248, 251 (9th Cir.1992). However, Eleventh Amendment immunity does not attach merely because a judgment will likely have some impact upon the state fisc. Instead, "it is the entity's potential *legal liability*, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant." *Eason v. Clark County School District*, 303 F.3d 1137, 1142 (9th Cir.2002) (citing *Regents of the Univ. of Calif.*, 519 U.S. at 431, 117 S.Ct. 900 (holding that the University of California enjoys Eleventh Amendment immunity despite the fact that it was indemnified by the federal government and therefore would not have to expend its own funds in satisfaction of a judgment)) (emphasis added) (internal quotation marks omitted). By consequence, even a local governmental body that receives essentially all of its funding from the state will not necessarily be deemed an arm of the state as long as the state is not legally required to account for whatever liability an adverse judgment might beget. *See Holz v. Nenana City Public School District*, 347 F.3d 1176 (9th Cir.2003) (finding no Eleventh Amendment immunity for an Alaska school district where the State of Alaska is not legally obligated to pay the district's debts even though the district receives 98% of its funding from the state).

In *Mt. Healthy City School District Board of Education v. Doyle*, the Supreme Court described "counties and similar municipal corporations" as quintessential non-state entities that cannot claim Eleventh Amendment protection, despite the fact that they often wield state-like authority. 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *see also Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 59 L.Ed.2d

401 (1979) ("[T]he Court has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a slice of state power."). Moreover, courts have previously held that California counties exist and operate as independent corporate bodies rather than "mere agent[s] of the State of California." *Moor v. County of Alameda,* 411 U.S. 693, 719, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973) (undertaking the type of "detailed examination of the relevant provisions of California law" described in *Regents of the Univ. of Calif, supra,* and holding that, for diversity purposes, California counties are not arms of the state); *see also Knight v. Carlson,* 478 F.Supp. 55, 56–58 (E.D.Cal.1979) (applying *Moor* and finding that California counties are not entitled to Eleventh Amendment protection).

## II. *Younger* Abstention

■ Under principles of comity and federalism, a federal court should not interfere with ongoing state judicial proceedings by granting injunctive or declaratory relief unless such interference is necessary to prevent substantial and immediate irreparable harm. *Younger v. Harris,* 401 U.S. 37, 43–54, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Samuels v. Mackell,* 401 U.S. 66, 68–74, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 433–34, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) (extending the general principle of *Younger* in stating that all proceedings that are "judicial in nature... are of a character to warrant federal-court deference."). Federal courts have even been obligated to abstain from hearing cases that might interfere with "administrative proceedings in which important state interests are vindicated, so long as in the course of those proceedings the federal plaintiff would have a full and fair opportu-

nity to litigate" her federal claim. *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986). Nonetheless, abstention "is the exception, not the rule." *Ankenbrandt v. Richards,* 504 U.S. 689, 705, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992).

■ *Younger* abstention is required when: (1) state proceedings, judicial in nature, are pending; (2) the state proceedings involve important state interests; and (3) the state proceedings afford adequate opportunity to raise the constitutional issue. *Middlesex County,* 457 U.S. at 432, 102 S.Ct. 2515. Implicit in this first factor is the fact that abstention is proper only when "the relief sought in federal court would in some manner directly 'interfere' with ongoing state judicial proceedings." *Green v. City of Tucson,* 255 F.3d 1086, 1097 (9th Cir.2001). A federal court action may be said to interfere with state judicial proceedings when the relief sought would force the federal court to "enjoin, declare invalid, or otherwise involve the federal courts in terminating or truncating the state court proceedings." *Id.* at 1098; *see also O'Shea v. Littleton,* 414 U.S. 488, 501, 94 S.Ct. 669, 38 L.Ed.2d 674 (finding that a federal action would interfere with a state judicial proceeding where it "would disrupt the normal course of proceedings in the state courts"). In addition, the rationale of *Younger* applies throughout appellate proceedings, requiring that state appellate review of a state court judgment be exhausted before federal court intervention is permitted. *See Huffman v. Pursue, Ltd.,* 420 U.S. 592, 607–11, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). Where *Younger* abstention is appropriate as to a request for declaratory or injunctive relief, the court may not retain jurisdiction, but should dismiss the action. *Juidice v. Vail,* 430 U.S. 327, 348, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Beltran v. California,* 871 F.2d

777, 782 (9th Cir.1988) (*Younger* abstention requires dismissal of federal action).

### III. *Mootness*

"A claim is moot if it has lost its character as a present, live controversy." *American Rivers v. National Marine Fisheries Service*, 126 F.3d 1118, 1123 (9th Cir.1997) (citing *American Tunaboat Ass'n v. Brown*, 67 F.3d 1404, 1407 (9th Cir.1995)). "In the context of declaratory and injunctive relief, [a plaintiff] must demonstrate that she has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that she will again be wronged in a similar way." *Bird v. Lewis & Clark College*, 303 F.3d 1015, 1019 (9th Cir.2002) (internal quotation marks and citation omitted), *cert. denied*, 538 U.S. 923, 123 S.Ct. 1583, 155 L.Ed.2d 314. Where the activities sought to be enjoined have already occurred, and the courts "cannot undo what has already been done, the action is moot." *Friends of the Earth, Inc. v. Bergland*, 576 F.2d 1377, 1379 (9th Cir.1978). "The burden of demonstrating mootness is a heavy one." *Northwest Environmental Defense Center v. Gordon*, 849 F.2d 1241, 1243 (9th Cir. 1988).

### *DISCUSSION*

#### I. *Eleventh Amendment Immunity*

##### A. *The State of California as Predominant Policymaker*

In its argument for Eleventh Amendment applicability, defendant does not employ the *Mitchell* factors as its point of departure and claim that the County satisfies them to the degree necessary to render it an arm of the state. Notably, the defendant does not even address the preeminent question of whether the state would be forced to assume legal liability for a judgment rendered against the County upon plaintiffs' complaint.

Rather, following the course charted by the Supreme Court in *McMillian v. Monroe County, Alabama*, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997), defendant argues that the State of California—not the County—is the relevant "policymaker" of foster care payment levels for the purpose of 42 U.S.C. section 1983 liability.[7] Defendant thus argues that only the State can be held responsible for the alleged deficiencies in plaintiffs' foster care. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[I]t is when execution of a policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). If this were the case, a suit ostensibly against the County would in fact run against the state as principal policymaker; the state is quite obviously immune from suit. *Edelman*, 415 U.S. at 668, 94 S.Ct. 1347.

By consequence, the first task addressed to this court is to decide whether the County can function as its own policymaker in the arenas in which plaintiffs have alleged it has failed to abide by applicable law, or whether it operates simply as an agent of the state. *See McMillian*, 520

---

**7.** The question posed by section 1983, viz., whether the state or the County is the true "policymaker" in this field, and that posed by the Eleventh Amendment, viz., whether the County is an "arm of the state," are related but distinct. As the subsequent discussion will indicate, the section 1983 inquiry focuses primarily on which party is empowered to make decisions regarding the formulation and implementation of various programs, while the Eleventh Amendment question centers around whether the state will be financially liable for a judgment against the County and touches peripherally on other questions of the County's fiscal and operational independence. It will thus be necessary for the court to consider each in turn.

U.S. at 784–785, 117 S.Ct. 1734 ("A court's task is to 'identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'") (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)); *id.* at 785, 117 S.Ct. 1734 ("Our cases on the liability of local governments under § 1983 instruct us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue."). This question is a matter of state law and must be answered with regard to the role that state law has assigned the County as executor of the foster care program. *Id.* at 786, 117 S.Ct. 1734.

### 1. Identification and Demarcation of Plaintiffs' Claim

The particular claim within plaintiffs' first cause of action against which defendant seeks immunity is the allegation that the subclass of plaintiffs was "denied adequate funding as mandated by [AACWA] section 672(a)." *Laurie Q. v. Contra Costa County*, 96–3483 MHP (January 31, 2003, Order), at 10:19–20; *see also* Compl. ¶ 10("(d) failing to ensure that disabled children received adequate funding to enable their foster parents to meet their special needs while in foster care."). Defendant appears to cast plaintiffs' claim as a challenge to the rates and amounts of foster care payments plaintiffs are entitled to receive under state law. Def. Mot., at 8. These rates are set by the State of California, and thus represent state policy in its plainest form. *See* Def.App. Exh. 1 (All Counties Letter No. 01–55); Def.App. Exh. 2, at 59 (DSS Manual Letter No. OPS–99–01, Reg. 11–401). Indeed, as defendant notes, the County is not permitted to alter the foster care payment schedules and rates set by the state. *See id.* ("Counties shall determine basic rates for AFDC–FC children placed in family homes in accordance with Welfare and Institutions Code Section 11461(a), (b), (c) and (d)."). There is little doubt—and plaintiffs do not appear to contest this fact—that a challenge to the state-set basic rate that requested retroactive monetary damages would be barred by the Eleventh Amendment. *Edelman*, 415 U.S. at 668, 94 S.Ct. 1347.

However, plaintiffs' complaint indicates (and plaintiffs' briefing papers confirm) that these claims are to be understood as challenges to the County's *administration* of the foster care system, *not* to the State of California's established rates. *See* Pl. Opp., at 4 ("Significantly, Plaintiffs are *not* arguing that state funding levels themselves are inadequate, or that the state has somehow compelled the county to fail these children.") (emphasis in original). Specifically, plaintiffs appear to allege that the County is "misapplying the State-set formulae for making foster-care maintenance payments" by miscalculating the "Specialized Care Increment" ("SCI"), "an amount paid to a family home *in addition to the family home basic rate* on behalf of an AFDC–FC child requiring specialized care because of health and/or behavior problems." Pl. Opp., at 4:7–8;[8] Def.App.

---

**8.** As the foregoing discussion may indicate, plaintiffs' explanation of their position in the relevant papers is hardly a model of clarity. The court draws its conclusion regarding the nature of plaintiff's claim in part from its context and placement within plaintiffs' complaint, which seems to allege a series of failures by the County to uphold what plaintiffs consider otherwise legitimate state policy: (a) failing to prepare adequate case plans for plaintiffs and other similarly-situated children in foster care; (b) failing to review those plans in a timely fashion; (c) failing to implement service plans that ensure that

Exh. 2, at 56 (11–400(6)) (emphasis added). At oral argument, plaintiffs and defendant represented to the court that the County determines the SCI for foster children on a case-by-case basis and possesses substantial discretion regarding the amounts that will be paid to each foster family;[9] this is in contrast to the "basic rate," which the County calculates in mechanical fashion according to a state-set formula.[10] Plaintiffs' claims thus arise not from the state's conduct in setting basic benefit rates, but from the County's conduct in administering the foster care program and determining the correct level of SCI funding it should be providing to foster children.

children would be placed in adoptive homes within the legally mandated timelines; (d) failing to ensure that disabled children received adequate funding to enable their foster parents to meet their special needs while in foster care; (e) misleading the appropriate reviewing courts so as to prevent disabled children from receiving meaningful periodic review of their cases; and (f) failing to provide disabled children with meaningful notice of their rights under federal and state law.

Compl. ¶ 10.

However, even this passage did not succeed in clarifying plaintiffs' allegations with sufficient precision for either the court or defendant. This problem is not foreign to this case. See Laurie Q. v. Contra Costa County, 96–3483 MHP (January 31, 2003, Order), at 9:9–11 ("The court commiserates with defendant in its effort to discern the muddled relationship between the allegations and requests for relief that appear in plaintiffs' second amended complaint and motion for class certification."). In fact, the court only learned of the specifics of plaintiffs' allegation, viz., that they challenge the County's computation of the Specialized Care Increment, at the oral argument on this motion held on February 2, 2004. Judging by the reaction of defendant's counsel, plaintiffs' particular allegations came as a surprise to defendant too. This litigation is now in its eighth year. The court simply cannot believe that it has taken defendant so long to explain its own position, and it is beyond cavil that both this court and defendant have expended countless hours address-

Defendant protests that plaintiffs' efforts to frame their claim as one for insufficient SCI payments represent simply another attempt to infuse life into their moribund allegation that the County has failed to provide adequate "special needs" payments to children who require such additional funds. Defendant notes that in limiting plaintiffs' first cause of action to claims under section 672 of the AACWA, this court has already cast a disapproving eye upon "special needs" related claims and questioned whether they can be properly brought under that statute. See Laurie Q. v. Contra Costa County, 96–3483 MHP (January 31, 2003, Order), at

ing putative theories of liability that never existed while ignoring plaintiffs' actual, unexpressed, allegations.

Enough. Plaintiffs' represented in open court on February 2nd that the claim for monetary damages in their first cause of action—for which this court has already certified a subclass—relates to defendant's failure to correctly calculate the Specialized Care Increment. Plaintiffs will be held to this representation.

9. While describing the County's role in setting SCI payments at oral argument, plaintiffs and defendant appeared to indicate that avenues for administrative or judicial review of the County's SCI determinations do exist. The parties were not specific regarding the precise fora or procedures according to which this review takes place, and the court will not opine here on the potential significance of that review.

10. During oral argument, plaintiffs' attorney stated that "to the best of [his] knowledge," all plaintiffs have received the proper "basic rate" payments from the County. Plaintiffs will be held to this representation, also. If plaintiffs do not communicate any contrary understanding to the court within a reasonable time after the issuance of this order, plaintiffs will be deemed to have admitted that the County has not been remiss in remitting to them any "family home basic rate" payments. Def.App. Exh. 2, at 56.

9:21–28.[11] Indeed, defendant argues that the state definition of "basic rate" payments *precisely mirrors* the AACWA's description of required "foster care maintenance payments," implying that any payments above and beyond the state's basic rate must (by definition) fall outside of what federal law demands. *Compare* 42 U.S.C. § 675(4)(A) ("The term 'foster care maintenance payments' means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation."), *with* Def.App. Exh. 2, at 59 (11–401.1) ("The family home basic rate shall include but not be limited to the cost of, and the cost of providing, the following items: Food, Clothing, Shelter, Daily supervision, School supplies, Personal incidentals, ... Reasonable travel to the child's home for visitation, [and] Liability insurance which covers the child.").

In response, plaintiffs argue that many of a child's "special needs" might well fall within the letter of the AACWA without being similarly captured in the state's actuarial calculations of the basic rate; for instance, a disabled child could require specialized "clothing" or a particular type (or quality) of "daily supervision" which the basic rate does not provide. The County would then be forced to plug the gap in funding between what the AACWA requires, and what the state basic rate provides, through the SCI. In other words, the facial congruence between state and federal statutory language is itself no guarantee that "daily supervision" holds the same meaning under the AACWA as it does under state regulations as applied to Contra Costa County's foster care children. Regardless, this question is *not* before the court on a motion to dismiss for failure to state a claim under section 672 of the AACWA, and so the court will not consider it in depth here. Suffice it to say that plaintiffs' allegation has passed the minimum threshold of plausibility necessary for this court to continue and address its viability under the Eleventh Amendment.

One final note is appropriate here. The court has certified as a subclass those plaintiffs who are entitled to monetary damages under plaintiffs' first cause of action, viz., the County's failure to make adequate foster care payments under the AACWA. *See Laurie Q. v. Contra Costa County*, 96–3483 MHP, at 10:2–4 ("That subclass would consist of those children in foster care who were or are entitled to adequate foster care maintenance payments as defined by 42 U.S.C. § 675(4)."). As both parties are undoubtedly aware, plaintiffs may maintain a class action only if "(2) there are questions of law or fact common to the class, [and] (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a). By consequence, the court certified this subclass pursuant to an explicit caveat: "if the adequacy of maintenance payments breaks down into particularized individual inqui-

---

**11.** "The court concurs with defendant that plaintiffs' use of the special needs" language is problematic in light of this court's August 1998 order on the County's motion to dismiss. The court dismissed several statutory grounds for plaintiffs' allegations that defendant declined "to ensure that disabled children received adequate funding to enable their foster parents to meet their special needs while in foster care." The court limited the basis for this claim to 42 U.S.C. section 672(a), which requires each state to make foster care maintenance payments to children who would have received AFDC aid but for their removal from their homes. Section 672(a) makes no reference to children with special needs. *Laurie Q. v. Contra Costa County*, 96–3483 MHP (January 31, 2003, Order), at 9:21–28.

ries the court may find it necessary to decertify the class." *Laurie Q. v. Contra Costa County*, 96–3483 MHP (January 31, 2003, Order), at 10:20–22. The parties have given this court reason to believe that the County determines SCI payment eligibility and amounts on a paradigmatically individualized basis. Indeed, the very nature of "specialized care" would seem to suggest that the County can properly award such payments only after case-by-case examinations. Plaintiffs' pursuit of redress on these terms thus calls into some doubt the subclass certification's tenability.

### 2. *McMillian and Brewster: Existing Law and the Analogy to Sheriffs*

The fact that plaintiffs are challenging County decisions—rather than state-set rates—hardly heralds the end of the court's inquiry. Defendant maintains that its non-discretionary administration of a state-funded, state-mandated program nonetheless renders the state the final policymaker for the foster care program under section 1983 and the Eleventh Amendment. Defendant cites this court to *McMillian*, the leading Supreme Court precedent in the field, which addresses the question of whether Alabama sheriffs acting in their "law enforcement capacit[ies]" operate as state or county policymakers. *McMillian*, 520 U.S. at 786, 117 S.Ct. 1734. While the analogy between the County's foster care program and a sheriff is not a perfect one, it functions reasonably well for present purposes: just as the County here administers a program whose contours are defined by the state, so too do sheriffs enforce a system of criminal law and procedure delineated almost entirely state statute and rule. *See Brewster v. Shasta County*, 275 F.3d 803, 809 (9th Cir.2001) (noting that Cal. Gov.Code § 12524 gives the California Attorney General the "power to call a conference of district attorneys, sheriffs, and police chiefs for the purpose of furthering 'uniform and adequate enforcement' of state law").

In holding that sheriffs operated as policymakers for the state, the *McMillian* Court relied upon the particular definition of the office of sheriff contained within the Alabama Constitution. The Court noted that the state Constitution lists sheriffs as members of the state executive branch, along with the governor, lieutenant governor, secretary of state, and attorney general. *Id.* at 787, 117 S.Ct. 1734. The Court characterized this fact as "critical[ ]," and pointed additionally to the fact that the Alabama Supreme Court has held that tort claims brought against sheriffs constitute suits against the state, not against the counties in which the sheriffs operate. *Id.* at 789, 117 S.Ct. 1734 ("Alabama counties are not liable under a theory of *respondeat superior* for a sheriff's official acts that are tortious."). Finally, the Supreme Court grounded its decision in the fact that "sheriffs are given complete authority to enforce the state criminal law in their counties. In contrast, the powers and duties of the counties themselves—creatures of the State who have only the powers granted to them by the State . . .—do not include any provision in the area of law enforcement." *Id.* at 790 (internal citation and quotation marks omitted).

Defendant urges that this court read *McMillian* with all possible breadth. Nevertheless, the Ninth Circuit, which here constitutes binding precedent, has recognized the peculiarity of Alabama's constitutional system and the Supreme Court's reliance upon those constitutional specifics in its decision. In *Brewster*, the Ninth Circuit held that California county sheriffs acting in their law enforcement capacities operate as policymakers for the counties, not the state, in the absence of the type of particular constitutional and

statutory indicia upon which the *McMillian* Court relied. *Brewster*, 275 F.3d at 807 ("the California Constitution clearly identifies the sheriff as a county officer") (citation omitted). The court placed emphasis on the sheriffs' local jurisdiction, explaining that "unlike in *McMillian*, where Alabama sheriffs were required to attend all courts in the state, California sheriffs are required to attend only those courts within their respective counties." *Id.* at 808.

Importantly, however, California sheriffs are not limited to enforcing municipal or county ordinances or otherwise cabined in regard to the laws they are sworn to uphold. Rather, sheriffs are *required* under California law to arrest "*all persons* who attempt to commit or have committed a public offense," Cal. Gov.Code section 26601, and "investigate public offenses which have been committed." Cal. Gov. Code § 26602. In other words, California's sheriffs are local, non-discretionary executors of a statewide criminal system; this alone does not render them instrumentalities of the state. *Brewster*, 275 F.3d at 811.

### 3. *Contra Costa County's Management of Foster Care*

■ The court turns next to the operation of Contra Costa County's foster care system. In order to resolve whether the County or the State of California functions as the predominant policymaker with respect to the actions alleged in plaintiffs' complaint, the court must conduct an inquiry that is specific both to the law of the state and to the particular governmental occupation in question. *McMillian*, 520 U.S. at 785, 117 S.Ct. 1734. Here, federal law charges the State of California with the responsibility of devising an appropriate "plan" for distributing "foster care maintenance payments" to eligible children. 42 U.S.C. § 672(a). California law codifies this "plan" in some detail, describing many of the processes involved in managing the cases of children admitted into California's foster care program. *See, e.g.,* Cal. Welf. & Inst.Code § 358 (Juvenile Court must receive into evidence a social study of the child conducted by a social worker appointed by the court); Cal. Welf. & Inst.Code § 16503 (administrative agency responsible for placement and care of the child must conduct periodic reviews of "the adequacy of services provided to the child").

Nonetheless, as the very existence of this case makes clear, California has chosen to delegate a portion of the responsibility and managerial authority for executing this plan to the several counties, charging them with the calculation and disbursement of benefits to the children under their care. Defendant has submitted materials describing the state rules by which the counties must abide. Def.App. Exhs. 1–2. These documents—framed as communications from the state to the County—illustrate the rubrics and formulae according to which the County must calculate foster care benefits in exquisite detail. *See, e.g.,* Def.App. Exh. 1, at 3 ("Schedule of FFA Treatment Rates Effective July 1, 2001"). However, they do little else. Defendant has not cited to this court—nor can this court locate—any instructions from the state to the County regarding the particulars of its operation: whom it must hire to staff its social service agency, the manner in which those employees are to perform their jobs, or how it must deal with public inquiries and complaints. The state simply informs the County of the amounts it must remit to foster children and families, disburses the required amounts to the County (via the state Department of Social Services), and permits the County to do the rest.[12]

---

**12.** The California Constitution and laws also     do not ascribe to the County any special sta-

#### 4. Analysis of the County's Program Under McMillian and Brewster

An understanding of the principles encapsulated in *Brewster* and *McMillian* that allowed defendant to find Eleventh Amendment sanctuary as an arm of the state would be expansive indeed. Together, those cases stand for the proposition that a local official (or body) must do more than operate under the auspices of a structure of mandatory state rules and imperatives, or even under the supervision of a state official. *See Brewster,* 275 F.3d at 808 ("Article V, section 13, of the California Constitution, places California sheriffs under the 'direct supervision' of the Attorney General."). A contrary rule would carve out an enormous exception from the heart of section 1983 jurisprudence, effectively immunizing all local law enforcement officers from suit in their official capacities. Indeed, defendant's position knows no logical bounds. California counties— like the counties of nearly all states—are creatures of state law, created by the state Constitution and endowed with only the powers granted to them under state law. *See, e.g., Moor,* 411 U.S. at 719, 93 S.Ct. 1785 ("Ar. 11, s 1(a), of the California Constitution... provides that '(t)he State is divided into counties which are legal subdivisions of the State.'"); Cal. Govt. Code § 23000 (granting corporate powers to counties); *id.* at §§ 945, 23004(a) (granting counties the power to sue and be sued); *id.* at § 970.2 (rendering the county liable for any judgments against it and authorizing the county to levy taxes to pay these judgments). At its most extreme, defendant's suggestion would contradict decades of section 1983 jurisprudence, shrouding counties in an Eleventh Amendment mantle they previously did not enjoy. *See Monell,* 436 U.S. at 691, 98 S.Ct. 2018. *Brewster*'s continued existence within *McMillian*'s shadow demonstrates that a state must genuinely and explicitly deputize a county official as a state actor before that official may receive Eleventh Amendment protections.

Within the County's articulation of the rule it believes the court should adopt lies the root of its logical untenability. The County declares that "when the County makes foster care maintenance payments under section 675(4) of the CWA, it acts *in furtherance* of a mandatory state policy and is an arm of the State for purposes of the Eleventh Amendment." Def. Reply, at 4:20–22 (emphasis added). Defendant has failed to recognize the distinction between a government actor who *correctly and faithfully* carries out a policy set by the state, and one who commits *non-state-sanctioned violations* of law in the course of her duties under a state program. When the County *accurately* applies the state's mandatory foster care payment schedule (or when a law enforcement officer serves a warrant pursuant to a mandate from a state court), it acts as the former, and a plaintiff may seek recourse only against the state for establishing the policy. However, if the County *incorrectly* calculates benefits or embezzles funds from foster children (or when a law enforcement officer *unlawfully assaults* a suspect taken into custody pursuant to a mandate from state court), it acts as the latter, and a plaintiff may seek recourse against the County. The state did not formulate the "policy" that led to the unlawful activity. Just as *respondeat superior* liability does not lie against the County for acts of individual, non-policymaking officers, it does not lie against the state for the actions of disobedient counties. *Monell,* 436 U.S. at 693, 98 S.Ct. 2018.

Defendant's citation to *Scott v. O'Grady,* 975 F.2d 366 (7th Cir.1992), serves as an excellent illustration of this point. In that

tus as a state actor for the purposes of its

administration of the foster care program.

case, plaintiffs were two former tenants whom the Cook County Sheriffs had unlawfully evicted from their apartments pursuant to a "Writ of Assistance" from the state court. *Id.* at 367–68. Plaintiffs had not been properly named in the action or served with the writ before its execution. *Id.* at 368. Upon plaintiffs' suit against Cook County for damages stemming simply from the sheriff's service of the writ (not any extra-curricular tortious conduct), the Seventh Circuit held that the Sheriffs had operated as state actors in this particular capacity. *Id.* at 371. Significantly, the court rested its conclusion on the fact that the Sheriffs had performed *precisely* the task delegated to them by the state, and had performed that task in *precisely* the manner the state court intended: "O'Grady and Branch had a statutory, non-discretionary duty to execute this writ. Had they failed to execute the writ, O'Grady and Branch would have been in contempt of court and liable to [the party requesting the writ] for damages." *Id.* The Sheriffs were not accused of having assaulted the plaintiffs or otherwise having operated outside of the boundaries of their state authority under the writ, and thus the actions for which they had been sued were only those that the state had specifically instructed them to undertake. *Id.* Had the Sheriffs assaulted one of the plaintiffs or destroyed property while serving the writ (the prototypical section 1983 claims) it seems inconceivable that the Seventh Circuit could have reached the same result; to do so would be to immunize all local and county law enforcement officers against suit, simply because they are engaged in activities pursuant to their authority under state criminal law.

The court finds that the County acts as an independent policymaker (rather than a state instrumentality) for the purposes of section 1983 when it misapplies, miscalculates, or otherwise fails to distribute foster care benefits in violation of state and federal law.

### B. *Application of the Mitchell Factors*

While the County has not attempted to argue that it operates generally as an arm of the state for Eleventh Amendment purposes, in the interest of completeness the court will nevertheless review the County's standing under the five *Mitchell* factors. First, and most importantly, the state would possess no legal liability for any money judgment against the County premised on the violations alleged in this action; the County itself would be directly liable for violating state and federal law. *See* Cal. Govt.Code § 970.2. The County fares little better under the four remaining factors. While it undoubtedly performs "central governmental functions," it may sue or be sued, may take property in its own name, and holds an independent corporate identity. *Mitchell*, 861 F.2d at 201; Cal. Govt.Code §§ 945; 23000; 23004(a)-(d). The court thus finds that Contra Costa County is not an arm of the state for purposes of the Eleventh Amendment, a finding that confirms the conclusions of two other courts. *See Knight*, 478 F.Supp. 55; *cf. Moor*, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596.

### C. *Defendant's Other Contentions*

In its reply brief, defendant adduces two novel grounds for dismissing the portion of plaintiffs' first cause that prays for monetary damages. Echoing, in some respects, its previous argument that the state acts as the relevant policymaker for section 1983 purposes, defendant claims that section 1983 does not provide a cause of action against a county fulfilling a "mandatory state policy." Def. Reply, at 5:5. Defendant argues in addition that "plaintiffs have not alleged, and cannot allege, that they failed to receive basic

rate payments as required under the State's mandatory policy," and have thereby been deprived "adequate Foster Care Maintenance Payments" under section 675(4) of the AACWA. Def. Reply, at 5:26–27.

As this court has already explained, plaintiffs appear to be alleging precisely that. Moreover, this is the *only claim* for damages of this type that plaintiffs are now capable of sustaining. It may be, as defendant asseverates, that plaintiffs have already admitted that they have received such payments in the correct amounts. Nonetheless, defendant has offered these two grounds for dismissal—which concern issues not noticed in defendant's original motion—only in its reply brief, and plaintiff was neither on notice that these topics might be raised nor provided an opportunity to respond. Defendant's additional arguments may be properly the subject of a subsequent motion to dismiss. The court will not consider them here.

## II. *Younger Abstention*

### A. *Interference With an Ongoing State Judicial Proceeding*

#### 1. *Existence of an Ongoing State Judicial Proceeding*

In order to invoke *Younger* abstention, the County must demonstrate as a threshold matter that "state proceedings, judicial in nature, are pending." *Middlesex County,* 457 U.S. at 432, 102 S.Ct. 2515. Close examination of Contra Costa County's foster care system places the existence of a pending judicial proceeding beyond doubt. The Juvenile Court—which the parties agree is a classically judicial body—retains jurisdiction over foster children throughout the entire duration of their care and administration within the system. Cal. Welf. & Inst.Code §§ 300, 366, 366.3(a). Indeed, these children are denominated "dependent child[ren] of the court." *Id.* at § 300. The Juvenile Court

conducts mandatory review hearings every six months for some of the children within the foster care system, and every year for those children whose cases have received the "permanent plan" designation. *Id.* at §§ 366, 366.3; Def.App. Exh. 3, at I. Concerned parties may also petition the court for any type of relief regarding the care of the child during the interstices between these review hearings. Cal. Welf. & Inst. Code § 362.

Moreover, the Juvenile Court holds ultimate authority over the formulation of the case plans that serve as the guiding documents for foster children's care, and regarding which plaintiffs' prayer for injunctive relief is directed. *See* Complaint ¶ 10(a)-(c). The Juvenile Court is required to review the case plan at all periodic hearings and monitor compliance with the plan, and may order any modifications to the plan that it deems necessary and appropriate. *See* Cal Welf. & Inst.Code §§ 362, 366, 16501.1(f)(12). While a child's casework supervisor may alter the plan between periodic hearings without court approval, any modification is subsequently appealable to the Juvenile Court. *Id.* at §§ 362, 16501.1(f)(12). In fact, under Contra Costa County's "permanent plan" policy (involving mixed administrative and judicial review), an administrative recommendation to alter the case plan triggers automatic review before the Juvenile Court. Def.App. Exh. 3, at III.C.3. Plaintiffs' conclusion that California has "followed the administrative approach... for preparing and reviewing case plans, rather than the judicial review approach" is plainly incorrect. Pl. Opp., at 8:19–20.

Contra Costa County's foster care system also bears a strong resemblance to foster care arrangements that appellate courts in other jurisdictions have consistently deemed to involve "ongoing judicial proceedings." *See, e.g., 31 Foster Children v. Bush,* 329 F.3d 1255, 1277 (11th

Cir.2003) (holding that an ongoing state proceeding exists where the state trial court holds an initial adjudicatory hearing regarding a potential foster child, "retains continuing jurisdiction over a dependency case and reviews the child's status at least every six months," must approve the case plan, and may amend the plan "on its own motion or that of a party"); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1291 (10th Cir.1999) ("We hold that the continuing jurisdiction of the Children's Court to modify a child's disposition, coupled with the mandatory six-month periodic review hearings, constitutes an ongoing state judicial proceeding.") (citations omitted); *Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253, 1267–68 (10th Cir.2002) (addressing the same foster care system, viz., New Mexico's, at issue in *Valdez*); *cf. Nelson v. Murphy*, 44 F.3d 497, 501 (7th Cir.1995) (finding an ongoing judicial process where the Illinois criminal court was required to "supervise the confinement of persons found not guilty by reason of insanity," including reviewing the treatment plan for each inmate every sixty days).

Were the County to divest the Juvenile Court of responsibility for periodically reviewing case plans in permanent plan situations—as it may under state law—this action might stand on significantly different footing. Under present circumstances, the substantial oversight role that the Juvenile Court must play during the pendency of a child's care within the foster system is sufficient to create an ongoing judicial proceeding for the purposes of *Younger*. Because the Juvenile Court retains final authority over the case plan and may entertain challenges to it and order necessary relief, the court finds it unnecessary to consider whether the work of the Administrative Review Panel would itself constitute the type of judicial proceeding towards which *Younger* abstention must be directed. California's foster care system, as operated by Contra Costa County,

situates its dependent children within an ongoing judicial proceeding.

### 2. *Interference With the State Proceeding*

As a secondary threshold matter, this court must next consider whether plaintiffs' prayed-for injunctive relief will necessarily interfere with the ongoing state judicial processes described above. *Green*, 255 F.3d at 1094–1097 (considering whether the particular "relief sought in federal court would in some manner directly 'interfere' with ongoing state judicial proceedings"). Plaintiffs have asked this court to rectify through injunctive relief what they believe are the County's numerous failures to adequately provide for their welfare through the proper management of their case plans. *See* Complaint ¶ 10. Plaintiffs believe that the County has inadequately prepared, reviewed, and implemented their case plans, and allege in addition that the County has misled the Juvenile Court so as to deprive them of meaningful review and due process. *Id.* Consequently, plaintiffs' request for an injunction—whether styled to run against a County agency, the County itself, or even the Juvenile Court—amounts to an entreaty for this court to oversee the Juvenile Court's performance, for it is that body that ultimately must pass upon the efficacy and propriety of the case plans at issue. This court would be placed in the position of final arbiter, approving or disapproving of the Juvenile Court's reviews of plaintiffs' case plans under § 16501.1(f)(12) and § 16503. Plaintiffs might even go so far as to request that this court enforce the Juvenile Court's own rules of process and notice, as they appear to allege that its own efforts have been unsatisfactory. *See* Complaint ¶ 10(e)-(f).

Granting plaintiffs' request for injunctive relief and placing this court in the position of supervising the Juvenile Court's

case plan adjudications would force it to engage in the type of interference the Ninth Circuit specifically criticized in *City of Tucson*. Plaintiffs protest that they have asked the court only to guarantee their rights to proper care as foster children under state and federal law; while true, this contention elides the reality of the relief plaintiffs have sought in federal court. Were this court to assume the role plaintiffs intend, it would be forced to pass judgment upon the Juvenile Court's approval (or disapproval) of certain case plans, potentially invalidating that Court's sanction of certain "inadequate" modifications. *Compare Citizens for a Better Env't v. Union Oil Co.*, 83 F.3d 1111, 1119 (9th Cir.1996) ("...the [Younger] doctrine is simply not relevant where the federal action is not seeking a ruling on the validity of the state action."). In order to cure the Juvenile Court's "fail[ure] to review those plans in a timely fashion," this court might be compelled to either spur the Juvenile Court by injunction, or even take the matter completely out of its hands. Complaint ¶ 10(b). In short, a grant of

relief to plaintiffs will likely obligate this court "to enjoin, declare invalid, or otherwise involve the federal courts in terminating or truncating state court proceedings." *City of Tucson,.*255 F.3d at 1098. Under *Younger,* such involvement in the affairs of a parallel state tribunal is impermissible.[13]

Again, this holding accords with the decisions of the Tenth and Eleventh Circuits in *Valdez* and *31 Foster Children.* In *Valdez,* the Tenth Circuit described a level of putative interference similar to what might result in the instant case: "The federal court would, in effect, assume an oversight role over the entire state program for children with disabilities. This places the federal court in the role of making dispositional decisions such as... whether to modify a treatment plan." *Valdez,* 186 F.3d at 1291–92. The *31 Foster Children* court highlighted similar concerns, noting that "[t]he federal court relief might effectively require an amendment to a child's case plan that the state court would not have approved, and state law gives its courts the responsibility for deciding upon such an amend-

---

**13.** At oral argument plaintiffs cited this court to *Kenny A. v. Perdue*, 218 F.R.D. 277 (N.D.Ga.2003). Plaintiffs note correctly that the foster care system in operation in Georgia is quite similar to that of Contra Costa County. Yet the subject of the lawsuits in that case and the present action—and the remedies sought in each—are decisively distinct. In fact, a juxtaposition of the remedy sought in *Kenny A.* and plaintiffs' prayer for relief in the present case serves to highlight the impropriety of the injunctive remedy plaintiffs request here. In *Kenny A.*, plaintiffs' claims centered around the internal practices and procedures of executive-branch actors, including several county Departments of Family and Children Services. Plaintiffs alleged, *inter alia,* that these Departments were "(1) assigning excessive numbers of cases to inadequately trained and poorly supervised caseworkers; [and] (2) not developing a sufficient number of foster homes properly screened to ensure the plaintiff children's safety...." *Id.* at 286.

Plaintiffs sought relief that would run only against these executive-branch defendants; for instance, they prayed for a court order "ensur[ing] that State Defendants develop an adequate and reliable computer database." *Id.* at 287. The district court noted specifically that "the declaratory and injunctive relief plaintiffs seek is not directed at [plaintiffs'] review hearings, or at Georgia's juvenile courts." *Id.* at 286. "To the contrary, the relief sought by plaintiffs would at most simply support and further the juvenile court's own mission of ensuring that children removed from their parents' custody because of abuse or neglect are not further harmed when the juvenile court orders them into the custody of the state." *Id.* The same cannot be said here. When this court is asked to overturn the Juvenile Court's orders regarding the care of foster children within the County's system, it is surely not "simply supporting and furthering" the Juvenile Court's own work.

ment." *31 Foster Children*, 329 F.3d at 1278. Both courts found this degree of involvement unacceptable. *Id.* at 1279; *Valdez*, 186 F.3d at 1292. In the eyes of *Younger*, plaintiffs are undone by the particularities of their allegation; the remedies they seek cannot be accomplished without substantial interference in affairs otherwise left to the state courts.

### B. *Important State Interests*

*Middlesex* next instructs this court to determine whether the state proceedings at hand implicate important state interests. *Middlesex County*, 457 U.S. at 432, 102 S.Ct. 2515. The parties agree that the State of California holds a significant interest in the health and well-being of minors within the state, and thus that suits against California's foster care system implicate an important state interest. *See American Acad. of Pediatrics v. Lungren*, 16 Cal.4th 307, 348, 66 Cal.Rptr.2d 210, 940 P.2d 797 (1997) (the state has a compelling interest in "the protection of the physical, emotional, and psychological health of minors").

### C. *Opportunity to Raise Federal Issues in State Court*

The final prong of the *Middlesex* test directs this court to evaluate plaintiffs' ability to bring their federal claims before the state tribunal. *Middlesex County*, 457 U.S. at 432, 102 S.Ct. 2515; *see also Communications Telesystems Int'l v. Cal. Public Utility Comm'n*, 196 F.3d 1011, 1019 (9th Cir.1999) ("The third prong of the *Younger* analysis asks whether the plaintiff has or had an 'adequate' or 'full and fair' opportunity to raise [her] federal

claims in the state proceedings.") (citation omitted). As the court has described in some detail above, California law has conferred upon the Juvenile Court the sweeping power to address nearly any type of deficiency in the care of a minor and order nearly any type of relief. The language is undebatably broad:

> [T]he court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the minor, including medical treatment... the court may, after giving notice and an opportunity to be heard, join in the juvenile court proceedings any agency that the court determines has failed to meet a legal obligation to provide services to the minor.... The juvenile court may direct any and all reasonable orders to the parents or guardians of the minor who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out the provisions of this section.

Cal. Welf. & Inst.Code § 362(a), (c).[14] Moreover, the Juvenile Court holds specific authority over the particular subjects of attention in this case: the formulation and modification of case plans—including the plans' compliance with the AACWA and other federal law—and the County's adherence to case plan mandates. *Id.* at §§ 366, 366.3, 16501.1(f)(12); Def.App. Exh. 3, at III.C.3; *In re Brian R.*, 2 Cal.App.4th 904, 923, 3 Cal.Rptr.2d 768 (1991) (reviewing the Juvenile Court's finding that a case plan did not violate the AACWA).[15] Plaintiffs' contentions to the contrary are simply false. *See* Pl. Opp., at 16:19–20 ("The juvenile court has nothing

---

**14.** Aggrieved parties may also appeal Juvenile Court decisions to California's appellate courts. *See, e.g., Los Angeles County Dep't of Children and Family Services v. Lillian S.*, 82 Cal.App.4th 1032, 98 Cal.Rptr.2d 655 (2000).

**15.** To be sure, the Juvenile Court's power is not infinite. For instance, if the Court declares a minor free from the custody of her parents, the Department of Social Services (DSS) assumes "exclusive" custody and control over the child and may select a foster

to do with writing or amending the case plan.").

The Juvenile Court's authority is limited, however, in one respect. Section 362 of the Code states that "[t]he court has no authority to order services unless it has been determined through the administrative process of an agency that has been joined as a party, that the minor is eligible for those services." Cal. Welf. & Inst. Code § 362(a). Presumably, under this section even a well-intentioned and well-informed Juvenile Court could be stymied in its attempts to provide fully for plaintiffs' welfare by intransigent administrative bodies that refuse to certify those plaintiffs as eligible for needed services. Yet this limitation will not necessarily impede plaintiffs' efforts to obtain complete relief and remediation before the Juvenile Court. Plaintiffs' allegations against the County, while referencing a "fail[ure]" to prepare adequate case plans," do not include a specific claim that the Juvenile Court has endeavored to order services and been frustrated by an agency's deficiency in authorizing adequate relief. A "federal court should assume that the state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987); *see also Middlesex County*, 457 U.S. at 431, 102 S.Ct. 2515 ("Minimal respect for the state processes, of course, precludes any *presumption* that the state courts will not safeguard federal constitutional rights.") (emphasis in original). Unless plaintiffs can adduce specific evidence indicating that agency inaction has neutered the Juvenile Court—an act which plaintiffs' pleadings fail to accomplish—this court has no choice but to abstain under *Younger*.[16]

care placement for the child at its discretion. Cal. Welf. & Inst.Code § 366.3(j). The juvenile court "is limited to reviewing whether DSS abused its discretion in placing the minor or in determining that the placement, once made, remains appropriate." *Dep't of Soc. Servs. v. Superior Court of Siskiyou County*, 58 Cal.App.4th 721, 724, 68 Cal.Rptr.2d 239 (1999). The court may review the placement only for abuse of discretion. *Id.* at 724–725, 68 Cal.Rptr.2d 239. Also, the Juvenile Court does not possess jurisdiction over every ancillary party to a child's custody determination. *See In re Jody R.*, 218 Cal.App.3d 1615, 267 Cal.Rptr. 746 (Juvenile Court does not have jurisdiction over the boyfriend of a minor's parent). Nevertheless, none of these exceptions is of particular relevance here. There is no indication that the Juvenile Court must defer to the judgment of any administrative body when reviewing case plans or that the Court lacks the power to join all parties necessary to redress plaintiffs' grievances.

**16.** Plaintiffs' leading case to the contrary, *LaShawn A. ex rel. Moore v. Kelly*, 990 F.2d 1319 (D.C.Cir.1993), offers a clear illustration · of the type of action (unlike the one at issue here) that cannot properly be litigated before a local family court and thus would defeat a request for abstention. In *Kelly*,

[t]he children attacked a child-welfare system which they alleged is characterized by ineptness and indifference, inordinate caseloads and insufficient funds. The district court found that, because of the appalling manner in which the system is managed, children remain subject to continuing abuse and neglect.... The court also found that youngsters who have been taken into the custody of the District's foster-care system languish in inappropriate placements....

*Kelly*, 990 F.2d at 1320. The plaintiffs requested an injunctive remedy that would have required the federal courts to oversee all aspects of the District of Columbia's management of its foster care system, possibly including budgetary, staffing, and workload management decisions. *Id.* at 1323. The local court proceedings open to plaintiffs in that case represented those available here, including "(1) a 'neglect proceeding' adjudicating a neglect petition filed by the Corporation Counsel against the child's parents, (2) periodic review hearings, and (3) proceedings adjudicating motions to terminate parental rights." *Id.* The court held that these individualized proceedings did not provide an adequate opportunity for plaintiff to litigate her

III. *Mootness*

█ This action was commenced with the filing of plaintiffs' original complaint in 1996. Defendant has drawn to this court's attention the fact that by now all named plaintiffs have been adopted. *See* Def. Req. for Jud. Not. Exh. A (adoption certificate for Laurie Q.), Exh. B (adoption certificate for Angel L.), Exh. C (adoption certificate for Megan W.), Exh. D (adoption certificate for Christina T.), Exh. E (adoption certificate for Rebecca T.), Exh. F (adoption certificate for Jesse B.), Exh. G (adoption certificate for Cherida L.).[17] Once a child has been adopted, that child is no longer under the auspices of Contra Costa County's foster care system and the Juvenile Court's jurisdiction over the child is ended. *See* Cal. Welf. & Inst.Code § 366.3 ("When the adoption of the minor has been granted, the court shall terminate its jurisdiction over the minor.").

While plaintiffs have argued that their adoption should not moot the entire action (or the class certification), they have not disputed that their adoption moots their own individual claims for prospective injunctive relief. Nor can they; once adopted, plaintiffs are unlikely to find themselves back within the County's foster care system and thus cannot demonstrate with substantial probability that they will suffer future harms at the hands of the County. *Bird,* 303 F.3d at 1019. Defendant has not moved to decertify the class or moot the remaining claims, and so the court need not address the legal issues that might arise from such actions. Named plaintiffs' claims for prospective injunctive relief contained in the first, third, and

much broader, systemic claims; it was not within the D.C. court's purview to direct the local agency's internal operations. By contrast, the allegations at issue here reach to the very heart of the Juvenile Court's responsibility and core competency, viz., determining the best program of services and placement for each individual child.

sixth causes of action are hereby dismissed for mootness.

*CONCLUSION*

For the foregoing reasons, defendant's motion to dismiss is GRANTED in part and DENIED in part. Plaintiffs are not granted leave to amend their complaint. This is plaintiffs' second amended complaint, and the court sees no indication that allowing any further amendment would cure the numerous deficiencies here.

IT IS SO ORDERED.

17. Plaintiffs have not disputed the veracity of these exhibits or objected to them in any other manner. The documents contained therein appear to be valid public County records, and so the court will take judicial notice of them.